320 P.3d 912

PILAʻA 400, LLC, Petitioners/Appellant–Appellant,

v.

BOARD OF LAND AND NATURAL RE-SOURCES and Department of Land and Natural Resources, State of Hawaiʻi, Respondents/Appellees–Appellees.

No. SCWC–28358.

Supreme Court of Hawaiʻi.

Feb. 14, 2014.

Wesley H.H. Ching and Kathleen M. Douglas, Honolulu, for petitioner.

William J. Wynhoff, for respondent Department of Land and Natural Resources.

Diane Erickson and Russell A. Suzuki, Honolulu, for respondent Board of Land and Natural Resources.

ACOBA, McKENNA, and POLLACK, JJ., with Circuit Judge TRADER, in Place of RECKTENWALD, C.J., Recused, with NAKAYAMA, J., Acting C.J., Concurring and Dissenting.

Opinion of the Court by POLLACK, J.

This case requires us to consider whether Pilaʻa 400, LLC (Pilaʻa 400) was properly held responsible for remedial, restoration, and monitoring costs assessed against it by the Board of Land and Natural Resources (BLNR) for despoilment of state conservation land resulting from unauthorized land use by Pilaʻa 400, which included significant harm to a near-pristine coral reef.

We hold that BLNR had jurisdiction to institute the enforcement action, the BLNR was not required to engage in rule-making before imposing a financial assessment for damages to state land against Pilaʻa 400, and Pilaʻa 400 was afforded a full opportunity to be heard at a contested case hearing following reasonable notice. Accordingly, we affirm the Judgment on Appeal of the Intermediate Court of Appeals (ICA).

I.

A.

Pilaʻa 400 owns a 383–acre parcel of rural land (Property), located on the north shore of Kauaʻi.[1] The Property is a level to gently sloping plateau broken by four gulches extending from Kuhio Highway and Koolau Road toward the shoreline. The plateau above and between the gulches naturally drains water and sediment along contours that form distinct geographic drainage areas.

At the makai[2] terminus of the Property is Pilaʻa Beach and Pilaʻa Bay. Pilaʻa Beach is a white sand beach approximately fifty to one hundred feet wide, bisected by Pilaʻa Stream. Pilaʻa Bay contains a well-developed fringing reef, extending from Keʻilu Point on the west to Kepuhi Point on the east. Wave action over the reef flushes the inner reef area, creating a lush environment for a wide variety of marine life. Pilaʻa Bay's inner reef is one of only a few shallow reefs on the northeast coast of Kauaʻi protected from ocean swell by an outer reef. Prior to November

---

1. Pilaʻa 400 obtained the Property from Pflueger Properties, LP by warranty deed, executed on January 23, 2001, by James H. Pflueger.

2. "Makai" means "toward the sea, in the direction of the sea." *State v. Tagaolo*, 93 Hawaiʻi 314, 318 n. 6, 2 P.3d 718, 722 n. 6 (App.2000) (citing M. Pukui and S. Ebert, Hawaiian Dictionary 225 (1979)).

26, 2001, Pila'a Bay was well-known for its striking beauty and as an excellent site for swimming, snorkeling, fishing, and gathering edible seaweed. According to the DLNR, the reef at Pila'a Bay was one of the "few remaining high value coral reef flats in the state that had largely escaped encroachment from development and stress from improper land practices." The reef was "an extremely valuable resource" with a wide range of reef habitats, abundant marine life, and almost fourteen percent coral cover.

Pila'a Beach and Bay are public lands owned by the State of Hawai'i, subject to several privately owned kuleana.[3] The Department of Land and Natural Resources (DLNR) is responsible for managing, administering, and exercising control over all of the public land in the state, including water and coastal areas. The DLNR is "headed" by BLNR. Hawai'i Revised Statutes (HRS) § 171-3(a) (2011).[4] The BLNR is constitutionally mandated to conserve and protect Hawai'i's natural resources.[5] The BLNR defines "land" to include coastal areas and submerged land. Hawai'i Administrative Rules (HAR) § 13-5-2 (1994).

Pila'a Beach and Bay lie within a State Land Use Conservation District (Conservation District) as a strip of land ranging from 175 to 250 feet wide and running along the makai edge of the Property. The Conservation District is divided in two sections. The Conservation District land located mauka[6] of the shoreline boundary is in the "limited" subzone,[7] consisting of the white sand beach. The Conservation District land makai of the shoreline boundary consists of the near-shore submerged lands and is in the "resource" subzone.[8] Regulated land use in a resource subzone includes the placement of fill on submerged land. HAR § 13-5-24. Pila'a reef is a part of the resource subzone.

Sometime prior to November 26, 2001, Pila'a 400 or its predecessors conducted extensive grading, filling, and other work on the Property. None of the work was authorized by permit. The unauthorized land use included: (1) large-scale grading on the plateau above the bay; (2) a vertical cut creat-

---

3. A "kuleana" is "a small area of land such as were awarded in fee by the Hawaiian monarch, about the year 1850, to all Hawaiians who made application therefor." *Bremer v. Weeks*, 104 Hawai'i 43, 45 n. 5, 85 P.3d 150, 152 n. 5 (2004) (quoting *Palama v. Sheehan*, 50 Haw. 298, 299 n. 1, 440 P.2d 95, 96 n. 1 (1968)).

4. HRS § 171-3(a) (2011) provides now, as it did at all times during the events at issue:

 (a) The department of land and natural resources shall be headed by an executive board to be known as the board of land and natural resources. The department shall manage, administer, and exercise control over public lands, the water resources, ocean waters, navigable streams, coastal areas (excluding commercial harbor areas), and minerals and all other interests therein and exercise such powers of disposition thereof as may be authorized by law. The department shall also manage and administer the state parks, historical sites, forests, forest reserves, aquatic life, aquatic life sanctuaries, public fishing areas, boating, ocean recreation, coastal programs, wildlife, wildlife sanctuaries, game management areas, public hunting areas, natural area reserves, and other functions assigned by law.

 HRS § 171-3(a).

5. The Hawai'i Constitution provides:

 For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water,....

 Haw. Const. art. XI, § 1.

 The legislature shall vest in one or more executive boards or commissions powers for the management of natural resources owned or controlled by the State, and such powers of disposition thereof as may be provided by law....

 Haw. Const. art. XI, § 2.

6. "Mauka" means "inland." *Diamond v. Dobbin*, No. 30573, 132 Haw. 9, 13 n. 8, 319 P.3d 1017, 1021 n. 8, 2014 WL 285388, at *2 n. 8 (Haw. Jan. 27, 2014) (citing Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary at 242 (1986)).

7. The objective of the limited subzone is to "limit uses where natural conditions suggest constraints on human activities.... Identified land uses ... are restricted to those listed in [HAR § ] 13-5-23." HAR § 13-5-12 (1994).

8. The objective of the resource subzone is "to ensure, with proper management, the sustainable use of the natural resources of those areas.... Identified land uses ... are restricted to those listed in [HAR § ] 13-5-24." HAR § 13-5-13 (1994).

ing a cliff forty to sixty feet in height within the Conservation District; (3) construction of a road along the base of the vertical cut; and (4) installation of a 30–inch pipe or culvert under the road that drained water and mud directly from the Property onto Pila'a Beach.

On November 26, 2001, the Property experienced heavy rainfall typical of the area at that time of year. The consequent erosion of the recently graded and filled hillside on the Property resulted in a massive mudflow into the Conservation District. Mud flowing from the Property poured into Pila'a Bay and covered land within the Conservation District in several feet of mud.

The November 26, 2001 mudflow severely damaged Pila'a Bay and reef. A scientific assessment begun in June 2002 by the DLNR and continuing through September of that year noted several indications of significant damage: (1) the shallow areas of the bay suffered from chronic turbid conditions; (2) corals were bleached, dead, dying, and becoming overgrown by algae; and (3) approximately 2,943 square meters of live coral were destroyed by the November 26, 2001 mudflow and subsequent sedimentation. The assessment concluded that, although much of the sediment had been cleansed from the beach due to natural wave action, sediment and its negative impacts remained at Pila'a. According to the assessment's conclusion, Pila'a might never be returned to its pre-mudflow conditions.

### B.

On January 28, 2002, pursuant to HRS Chapter 183C, the DLNR issued a Notice and Order (First Notice and Order) to Pflueger Properties, Limited Partnership (Pflueger Properties) for "illegal work conducted within the Conservation District at Pila'a[,] Kilauea, Kauai, Hawaii." [9] The First Notice and Order included the DLNR's initial assessment of potential unauthorized land uses in violation of state law.

We have determined that:

(1) The subject property, identified as tax map key 5–1–004:008 is in the Conservation District and is classified as *Limited* Subzone;

(2) The following uses were conducted on the subject premises: grading, grubbing,[10] cutting, and culvert construction;

(3) These uses were not authorized by the Department of Land and Natural Resources.

YOU ARE HEREBY ORDERED TO CEASE any further activity on the subject premises. Should you fail to cease such illegal activity immediately, you will be subject to fines up to $2,000 per day pursuant to Chapter 13–5, [HAR], in addition to administrative costs incurred by the Department and damages to State land.

(Footnote added).

On June 20, 2002, following a June 13, 2002 site inspection, the DLNR issued a second Notice and Order (Second Notice and Order) to Pflueger Properties for "Illegal Activity in the Conservation District." The Second Notice and Order required Pflueger Properties to submit a remedial Best Management Practices Plan for the affected conservation land and emphasized that the natural environment at Pila'a Bay suffered "unauthorized despoliation" due to "almost unimpeded" sedimentation resulting from the illegal land uses conducted on the property.

[A] massive vertical bench was cut into the hillside and remains unprotected from erosion. Evidently, this was done to construct a new dirt road.... This road now serves as a conduit for water and sediments, which end up in the sea almost unimpeded. A small valley that terminates near the beach was filled with large quantities of excavated soil. This area remains partly unvegetated. This latter action resulted in the diversion of a small stream, which originates from a spring several meters up the valley. This fill area

---

9. Pflueger Properties and James H. Pflueger were later dismissed from the case, leaving Pila'a 400 as the sole responsible party. *See* note 19, *infra.* Until the dismissal, DLNR and BLNR communications were directed either to Pflueger Properties or James H. Pflueger.

10. "Grubbing" means the removal of vegetation by scraping, dislodging, or uprooting vegetation that breaks the topsoil. HAR § 13–5–2.

is a serious source of sediments transported to the nearshore waters during periods of rainfall.

It was generally agreed that some immediate remedial actions could be taken, such as implementation of Best Management Practices (BMPs), to help abate sedimentation on nearshore waters.

.... [T]here is a need for immediate physical intervention to slow down runoff and sediments.

(Emphases added).

The Second Notice and Order also memorialized future remedial action the DLNR intended to take:

The landowner is reminded that these interim remedial actions in no way whatsoever, cures, exonerates or pardons the unauthorized despoliation of conservation values at Pila'a by the landowner. The matter of the unauthorized work at Pila'a Bay will be presented to the BLNR at a future date, time and place to be announced. In addition to fines and penalties for damages to State land, the landowner should be made aware of the possibility of the imposition of the requirement to conduct complete land restoration and long term monitoring to assess the recovery of the marine environment.

(Emphasis added).

On August 22, 2002, the DLNR issued an order for the implementation of emergency erosion and water pollution controls (First Implementation Order) detailed by the plan submitted by Pflueger Properties.[11] The First Implementation Order reiterated that erosion and sedimentation resulting from the illegal uses conducted on the Property continued to threaten Pila'a Bay.

On June 20, 2002, the DLNR issued you a second order, directing you to submit a Remedial Best Management Practices Plan to construct filter fences, plug a drainage culvert and grass certain areas in order to reduce erosion and sedimentation of waters within Pila'a Bay.

....

These measures would include the construction of a large rock berm within the eastern gulch, a series of smaller rock dams, sedimentation ponds, hydro mulching, etc.... [t]hese emergency measures would be implemented with the sole intent of forestalling erosion and prevention of further degradation of marine waters, which could occur this rain season unless appropriate measures are undertaken immediately.

....

In addition to fines and penalties for damages to State land, the landowner should be made aware of the possibility of complete land restoration and long term monitoring to assess the recovery of the marine environment.

(Emphases added).

On November 20, 2002, the DLNR issued a second implementation order (Second Implementation Order) to implement erosion and water pollution control measures within the shoreline area of Pila'a Bay. The Second Implementation Order emphasized that erosion continued to pose a threat to the immediate shoreline area and the marine waters and echoed the language of the previous order. "These emergency measures would be implemented with the sole intent of forestalling erosion and prevention of further degradation of marine waters which could occur this rainy season unless appropriate measures are undertaken immediately." (Emphasis added). Both the First and Second Implementation orders reiterated the intention of the BLNR to take future action.

The damage to the coral reef at Pila'a Bay was a central and continuing concern of the DLNR. On behalf of the BLNR, Dr. Paul Jokiel completed a scientific study entitled "Reef Coral Communities at Pila'a Reef in Relation to Environmental Factors" on December 12, 2002 (the Jokiel Report). The Jokiel Report extensively examined the effects of the November 2001 mudflows on

11. The Best Management Practices Plan ordered by the DLNR's June 20, 2002 letter does not appear in the record. DLNR's August 22 letter addressed to Pflueger Properties references this order and stated that it has "reviewed the submitted plan" and "conditionally approves the emergency measures...."

Pila'a reef and the surrounding area. It concluded that "the mudflow from the 26 November 2001 event entered the reef [at a time of low wave energy] ... so all of the sediment was deposited and retained in the shallow reef system," and "the shallow coral reef areas at Pila'a have undergone recent degradation." The degradation was shown by the impact of the sediment on the reef corals:

> c. Hard substrate in impacted areas is covered with mats of algae and terrigenous sediment[12] rather than the pink crustose coralline algae that would be expected. Sediments have combined with the fleshy algae into a thick matrix on hard surfaces.
>
> d. Presence of terrigenous mud has mixed with the carbonate sands on the beaches, intertidal and subtidal areas. The mixture bakes into a "hardpan" layer on impacted beaches.
>
> ....
>
> 3. Mudflows and increased rates of sediment input have resulted from grading of steep slopes along the shoreline with consequent accelerated erosion of soil onto the reef. Increased mud input is the cause as shown by the pattern of damage in relation to sediment sources and in shore ocean patterns.
>
> 4. Recovery of the damaged areas cannot begin until terrigenous input of sediment is curtailed.

(Emphases added).

The DLNR also conducted additional studies that examined the effects of sedimentation on the reef at Pila'a Bay. The "Report on Reconnaissance: Level Sedimentology Survey of Pila'a Reef Beaches, Kauai, Hawaii, August 5, 2002" concluded that "the reef and bay at Pila'a contain significant quantities of terrigenous mud," compared to a control beach which was "pristine." At the time of the report, some eight months after the November 26, 2001 mudflow, the report also noted:

> A concentrated plume of mud was continuously observed during the survey.... Pre-

sumably, this process has been ongoing since the November 2001 and May 12, 2002 rain events and will continue for months, perhaps even years into the future....

A second report entitled "Initial Data Regarding Pila'a Assessment," also completed in August 2002, noted particular concerns for the endangered Hawaiian green sea turtle. The report determined that there were significant long term impacts and concerns relating to displacement of native plants and animals by invasive species; enhancement of "fleshy algae" and cyanobacteria; decreased larval and planktonic organism survival; decreased fertilization success, sex reversal and deformities, and impacts to non-coral cryptic systems, mobile reef systems, and loss of three-dimensional substrate. The report also discussed economic values of the impact to the reef and possible mitigation strategies.

Pila'a 400 also commissioned two of its own scientific studies on sedimentation following the November 2001 mudflow and its effects on the reef. The first study, completed in February 2003 was entitled "Preliminary Sediment Runoff Analysis for Pflueger Property Restoration." The purpose of the study was to "estimate the potential annual historical sediment runoff from the Pila'a property." The study determined that the sediment run-off that occurred during the November 26, 2001 incident was not extraordinary for the area.

A second study, completed in March 2003 was entitled "Ecology of the Reef Ecosystem of Pila'a, Kauai and Analysis of Alleged Environmental Impacts Associated with Recent Sediment Run–Off," and was directed at determining the relationship between the November 2001 mudflow and the alleged damage to the reef. According to this report, the low coral cover at Pila'a was due to the naturally harsh ecological conditions. In addition, the study asserted that the sediment spill in November 2001 did not exceed the range of natural variability at Pila'a, suggesting that Pila'a 400 should not be held responsible for the damage.

---

12. In oceanography, terrigenous sediments are those derived from the erosion of rocks on land and consist of sand and mud carried to sea by rivers. Paul R. Pinet, *Invitation to Oceanography* 94 (2009)(available via Google Scholar, p. 94 [as of Feb. 13, 2014] ).

### C.

On August 22, 2003, a public meeting (Public Meeting) was held before the BLNR, during which DLNR staff presented a report (Staff Report) regarding "Alleged Unauthorized Grading, Grubbing, Filling, Road Construction, Landscaping, Drainage, Improvements, and Damages to State Land and Natural Resources Due to Excessive Sedimentation at Pila'a." The Staff Report enumerated four unauthorized uses within the Conservation District.

> [T]his report documents the unauthorized land uses within the conservation district. The unauthorized uses include [1][a] ... dirt road through gulch 2, and along the shoreline, [2][a] ... vertical cut in the coastal bluff, [3] ... fill and grading at the seaward extent of gulch 2, ... [4] ... storm drain construction adjacent to the beach.

The report continued: "These unauthorized improvements resulted in extensive damages to the shoreline and marine resources at Pila'a Bay, which was the focus of this report." (Emphases added.)

The Staff Report concluded "there is a strong evidentiary record ... linking the unauthorized work of Mr. Pflueger to coral reel damages at Pila'a Bay. The area of damages calculated ... is 5,830 square meters.... The comprehensive survey of corals provide strong statistical proof that the damages are a result of massive sedimentation events caused by the abutting landowner."

The Staff Report recommended, inter alia: (1) a penalty of $12,000 for "failing to obtain the appropriate approvals for road construction, grading, filling, and storm drain construction in six (6) instances within the conservation district;" (2) an assessment of $5,830,000 for "damaging state land and natural resources stemming from the unauthorized lands [sic] uses;" and (3) a fine of $38,000 for administrative costs.

Before the close of the Public Meeting, the Pflueger Properties, James H. Pflueger (Pflueger) and Pila'a 400 (collectively, the "Pflueger Parties") made an oral request for a contested case hearing. On September 2, 2003, the BLNR issued a letter (September 2, 2003 Letter) to "James Pflueger, Pflueger Properties" that referred to the Public Meeting and acknowledged the oral request for the contested case hearing.[13]

### D.

The focus of the contested case hearing was framed by the parties in pre-hearing statements. The first statement was an August 29, 2003 letter by the Pflueger Parties to the BLNR supplementing their oral request for a contested case hearing (Written Hearing Request). In the Written Hearing Request, the Pflueger Parties affirmed that the subject of the contested case hearing would be damages to Pila'a Bay and reef resulting from excess sedimentation caused by unauthorized grading activities in the Conservation District:

> The matter being considered by the [BLNR] concerns alleged damage to the reef flat and near-shore marine environment stemming from grading activities in the conservative [sic] district which allegedly resulted in discharges of sediment following a severe rainstorm on the night of November 26, 2001, December 2001, and early 2002.

(Emphasis added). The Written Hearing Request also contested the following facts and issues contained in the DLNR staff report presented at the Public Meeting:

- the statutory legal authority
- the responsible parties
- the scope and extent of the alleged damage to the reef flat and near-shore marine environment at Pila'a
- the amount of alleged damage that was directly caused by the Petitioners' grading activities as opposed to other causal factors
- the specific dates(s) when the alleged damage occurred

---

13. The September 2, 2003 Letter ordered Pflueger to pay a fine of $8,000 relating to four instances of unauthorized land use. In addition, the BLNR assessed $38,500 for administrative costs related to unauthorized land uses at Pila'a. At some time prior to February 17, 2004, the $8,000 fine and $38,500 in administrative costs were paid.

- evidence regarding assessment of the damages to the reef flat and near-shore marine environment and the alleged causes
- the amount of penalties proposed by the DLNR staff
- the statutory authority for and the method used by the DLNR to calculate penalties for the alleged damage to the reef flat and near-shore marine environment
- all factual and legal issues addressed in the DLNR staff report dated August 22, 2003
- DLNR staff recommendation items nos. 2, 4, 5, 6, 7, 8 and 9 as described in the DLNR staff report and
- any and all finds [sic] of fact and conclusions of law that may arise during the course of the contested case proceeding.

In its prehearing Statement on the Issues, dated February 17, 2004, the DLNR framed the purpose of the contested case hearing as follows:

> The only issue in this contested case proceeding is the determination of the amount of damages to be assessed against the Pflueger Parties for damages to the beach, reef, and marine environment ... which were largely the result of excessive sediment input dating from November 2001 and thereafter.

(Emphasis added).

In its Responsive Statement of the Issues dated March 1, 2004, the Pflueger Parties presented an extensive list of disputed facts and issues to be determined at the contested case hearing that included sedimentation, damages, causation, and the authority of the

BLNR, both generally and specifically to assess penalties and to require remediation. The Pflueger Parties contested that it violated the provisions of HRS § 183C and HAR Chapter 13–5 "by damaging state land and natural resources stemming from unauthorized land uses, for a penalty of $5,830,000." The statement disputed many of the findings of the Staff Report presented at the Public Hearing, including the sources and historic patterns of sedimentation into Pila'a Bay, "causation as to the alleged damage to the beach, near-shore marine environment, reef flat and/or deep water coral shelf at Pila'a"; "the scope and extent of the alleged damage to the beach, near shore marine environment, reef flat, and/or deep water coral shelf at Pila'a;" and "the amount of alleged damage that was directly caused by [the Pflueger Parties'] grading activities as opposed to other causal factors."

On October 3, 2003, the BLNR published a Notice of Contested Case Hearing (Contested Case Hearing Notice). It provided:

> The [BLNR] will conduct a contested case hearing on DLNR File No. KA–04–02 regarding an enforcement action involving the alleged damages to State land(s) and natural resources due to excessive sedimentation at Pila'a, District of Hanalei, Island of Kauai, seaward of TMK: 5–1–4:8 (por.). The hearing will be held pursuant to Chapters 91 and 183C, Hawaii Revised Statutes, and Chapters 13–1 and 13–5, Hawaii Administrative Rules (HAR).

(Emphasis added).[14]

The contested case hearing began on July 20, 2004, and continued over 13 days through August 13, 2004. The first activity in the

---

14. In its prehearing Statement on the Issues dated February 17, 2004, the DLNR also stated that the damages dated from November 2001. Based on the DLNR statement, the Pflueger Parties, which included Pila'a 400, moved to dismiss Pflueger Properties and Pflueger from the case (the Dismissal Motion) because Pflueger Properties had conveyed its ownership interest in the Property to Pila'a 400 earlier that year. The Dismissal Motion acknowledged that Pila'a 400 would remain the liable party.

> [Pila'a 400] is the party liable for any penalty incurred as a result of the wrongful acts of its manager. As a matter of law, [Pila'a 400] is the sole party responsible in this action[.]

Based on the foregoing representations, the DLNR did not oppose the Dismissal Motion. Similarly, the hearing officer's (Hearing Officer) April 29, 2004 dismissal noted that "[Pila'a 400] [was] the landowner of the [Property] at all relevant times." Therefore, Pila'a 400 was allowed to remain as the sole liable party. The BLNR's June 30, 2005 Findings of Fact, Conclusions of Law, and Decision and Order concluded, "As the owner of the Property ... Pila'a 400 was responsible to the State for the condition of the Property and for the consequences of any illegal activity on the Property by its predecessors[.]" Pila'a 400 did not contest that it was the responsible party in its application for writ of certiorari to this court.

contested case was a site visit by the hearing officer (Hearing Officer), who spent several hours exploring the reef with mask and snorkel and examining the beach. The Hearing Officer heard testimony and received exhibits from experts in marine science regarding damage to Pila'a Bay and reef. Both sides also presented multiple kama'aina [15] witnesses who testified as to the impact of the unauthorized land uses on fishing and beach-related activities at Pila'a Bay.

DLNR presented six experts in marine science to establish the damage to the Pila'a reef. Those experts included Dr. Paul Jokiel, an international expert on coral reefs and coral reef monitoring; Dr. Charles Fletcher, an internationally recognized expert on coastal sedimentary geology and carbonate reefs; David Gulko, a senior aquatic biologist with the DLNR and an expert in coral reef ecology; Dr. William Walsh, an aquatic biologist and resource manager with the DLNR and an expert in aquatic biology; Ryan Okano, a graduate student at the University of Hawai'i and an expert in algae; and Dr. Robert Richmond, a research professor at Kewalo Marine Laboratory and an expert in coral reef biology and their valuation.

Pila'a 400 called five expert witnesses to address the issues of excessive sedimentation and its effects on the reef at Pila'a. These experts included Dr. Richard Grigg, an expert in coral reef ecology and oceanography, Dr. Eric H. De Carlo, an expert in sedimentary geology, and Dr. Steve Dollar, an expert in biological oceanography, all co-authors of the sedimentation study submitted by Pila'a 400. Pila'a's 400's other experts were Paul Wallrabenstein, an author of a second sedimentation study submitted by Pila'a 400, an expert in civil engineering, and Dr. John Dixon, an expert in the field of environmental economics.

Following the contested case hearing, both parties submitted proposed findings of fact, conclusions of law, and decision and recommendations. The Proposed Findings of Fact, Conclusions of Law, Decision and Recommendation submitted by Pila'a 400 (Pila'a 400

Proposal) included, inter alia, the following arguments: (1) as the principal land use activities and source of the mudflow was land outside the Conservation District, the BLNR therefore lacked jurisdiction over those land use violations, and (2) Pila'a 400 was denied due process by DLNR's failure to engage in rule-making, as mandated by HRS § 183C–3(3), before assessing the damage penalty.

The DNLR Proposed Recommended Findings of Fact, Conclusions of Law, Decision and Order (DLNR Proposal) noted that the Pflueger Parties did not contest the September 2, 2003 Letter's findings of "violation[s] of the provisions of Chapter 183C HRS, and Chapter 13–5, HAR, by failing to obtain the appropriate approvals for road construction, grading, filling, and storm drain construction in four (4) instances within the conservation district." The DLNR Proposal described the unauthorized work on the Property and resultant mudflow, and extensively detailed the impact to the Conservation District and the damage to State land. The DLNR Proposal stated the damage to the reef and ecosystem were violations of HAR §§ 13–5–24, 30(b). The DLNR Proposal recommended the following "Discussion and Conclusions":

18. The November 26, 2001 mudflow and subsequent sedimentation constitute placement of solid material on land and the grading of land and are therefore a regulated land use with the meaning of [HRS] § 183C–2[ ].

19. Pila'a 400 did not have a [DLNR] or [BLNR] permit authorizing any land use in the [Conservation District].

20. The November 26, 2001 mudflow and subsequent sedimentation constitute marine construction within the meaning of HAR § 13–5–24.

21. Pila'a 400 did not have a [DLNR] or [BLNR] permit authorizing marine construction (including filling of submerged land). Nor could a permit be obtained for the filling of submerged land where protected marine resources are destroyed. Chapter 13–5 does not provide otherwise that Pila'a

___

15. "Kama'aina" means native-born, acquainted, or familiar. Mary Kawena Pukui & Samuel H. Elbert, New Pocket Hawaiian Dictionary at 50

(1992). It can also mean "a person familiar from childhood with any locality." *In re Boundaries of Pulehunui*, 4 Haw. 239, 245 (1879).

400 could undertake marine construction.

22. The November 26, 2001, mudflow and subsequent sedimentation events constitute violation by Pilaʻa 400 of [HRS] chapter 183C and violation of rules adopted in accordance with chapter 183C.

On December 22, 2004, the Hearing Officer entered Proposed Findings of Fact, Conclusions of Law, and Recommendation (Hearing Officer's Proposal). The Hearing Officer recommended that the BLNR assess Pilaʻa 400 $2,315,000,[16] representing the sum of restoration costs, the value of coral destroyed, the intrinsic value of Pilaʻa Bay, compensation for interim loss, and five years of monitoring the Pilaʻa reef community. The Hearing Officer's Proposal noted generally the provisions of HAR §§ 13–5–24 and 30(b), as well as other relevant sections of HAR Chapter 13–5. In regards to HAR §§ 13–5–24 and 30(b), the Hearing Officer's Proposal adopted the Discussion and Conclusions No. 18–22 from the DLNR Proposal. In addition, the Hearing Officer recommended that the BLNR assess administrative costs in the amount of $69,996.93.

Following the entering of the Hearing Officer's Proposal, both parties filed exceptions to the Hearing Officer's Proposal. In its exceptions, Pilaʻa 400 raised an objection to any findings based on HAR § 13–5–24 due to a lack of notice under HRS § 91–9. Pilaʻa 400 stated that it had "never received any notice, oral or written, that the contested case hearing was proceeding under the marine construction rules. There is not a single citation in the entire contested case record which even references 'marine construction.'" (Emphasis removed).

On March 29, 2005, the BLNR heard closing arguments.

On June, 30, 2005, the BLNR issued its Findings of Fact, Conclusions of Law, and Decision and Order (BLNR Order).

The BLNR Order ordered Pilaʻa 400 to pay $3,963,000 in damages as well as $69,996.93 for DLNR's administrative costs.[17] In arriving at the monetary amount, the BLNR Order found that the Hearing Officer's recommendations did not reflect "the BLNR's duty to protect this valuable natural resource."

> The value of Pilaʻa beach, bay and reef includes use value, option value, commodity value, existence value, bequest value, cultural values, including value to indigenous people, and intrinsic value. Economic and use (market) values alone cannot and do not capture the full value of Pilaʻa. Economic valuation alone understates the true social loss from natural resource damage. The intrinsic value of Pilaʻa is recognized by the Hawaiʻi constitution and state laws, including section 183C–1, HRS. The BLNR holds Pilaʻa and all state property in trust for the people of Hawaiʻi and for

---

16. The Hearing Officer also made the following recommendation:

 It is recommended that the $2,325,000 penalty be held in trust and applied to implement the Conceptual Remediation Plans whose estimated cost is three to five million dollars and to monitor the Pilaʻa Bay reef for five years. This will assure that the penalty is used to restore Pilaʻa Bay. If the construction costs of the Conceptual Remediation Plans exceed $2,000,000, [Pilaʻa 400, LLC] should pay the balance of the construction costs. If the construction and monitoring costs are less than the balance of the penalty not used to fund the Conceptual Remediation Plans and monitor Pilaʻa Bay for five years, then the balance of the penalty should be retained by the State of Hawaii.

 The "Conceptual Remediation Plans" were approved by the DLNR and were designed to ensure the Property was stable and no further run-

off would occur. It included removal of a trail in Gulch 2 and restoration of the stream to its previous location and configuration, extensive landscaping in Gulch 2, stabilization, filling and restoration of the shoreline cut, re-vegetation of the shoreline, and removal of the rock berm in Gulch 2.

17. The BLNR's conclusions differed from the Hearing Officer's recommendations in the following respects: (1) Pilaʻa Bay had incurred $3,333,000 in damages rather than $2,000,000; (2) monitoring should be conducted for 10 years at a cost of $630,000 instead of 5 years; (3) the damages award should be deposited in the special land and development fund rather that used to offset the restoration costs because "an offset would not compensate for the damages caused to Pilaʻa beach, bay, and reef."

future generations.[18]

The BLNR determined that "[m]udflows from Pila'a 400's Property into the [Conservation District] occurred because Pila'a 400 ... failed to obtain permits for the [unauthorized] work and failed to implement adequate sediment and water pollution controls."[19] The BLNR based Pila'a 400's liability for the damages on placement of dirt and sediment onto submerged lands.

2. The violation was placement of any solid material on land in the form of dumping or allowing to be put on conservation land (including submerged land) of a large unknown amount of dirt and sediment. The illegal act that was conducted on conservation land (including submerged land) was dumping or allowing to be dumped a large unknown quantity of dirt and mud without a permit as required by HAR §§ 13-5-24 and 13-5-30(b).

3. As the owner of the Property on November 26, 2001, thereafter, Pila'a 400 was responsible to assure that there was no unpermitted dumping onto conservation land, including submerged lands. As the owner of the Property on November 26, 2001, and thereafter, Pila'a 400 was responsible to the State for the condition of the Property and for the consequences of any illegal activity on the Property by its predecessors that resulted in damage to State land (including submerged land) after it acquired the Property

**18.** In addition, the BLNR reasoned:

Given the elements of value discussed above and in consideration of all the facts and evidence, including but not limited to the range of values stated in scholarly papers for reefs, the probable costs of restoration of Pila'a Bay and reef and beach, the value of the coral destroyed, and the intrinsic value of Pila'a Bay and reef, and the costs of monitoring for 10 years beginning in 2005, the BLNR rejects the Hearing Officer's recommendation of damages. Under the circumstances of this case, the Hearing Officer's recommendation as to the amount of damages is too lenient to reflect the BLNR's duty to protect this valuable natural resource under constitutional and statutory law.

**19.** As to the four violations identified in the September 2, 2003 letter, the BLNR Order enumerates that Pila'a 400 had: (1) created "a massive vertical cut ranging in elevation from 40 to 60

. . . .

5. Dumping soil onto conservation land falls within the definition of "land use" in HRS § 183C-2.[20]

. . . .

8. The November 26, 2001, mudflow and subsequent sedimentation events constitute placement of solid material on land and the grading of land and are regulated land use within the meaning of HRS § 183C-2.

. . . .

10. The November 26, 2001, mudflow and subsequent sedimentation events constitute violation by Pila'a 400 of HRS chapter 183C and violation of rules adopted in accordance with chapter 183C.

(Emphasis and footnote added).

### E.

On July 27, 2005, Pila'a 400 appealed the BLNR Order to the Circuit Court of the Fifth Circuit (circuit court). Pila'a 400 raised, inter alia, the following points of error on appeal:

(1) The BLNR order violates Haw.Rev. Stat. § 91-3 and Haw.Rev.Stat. § 183C-3(3) because the BLNR had no rules establishing a methodology for calculating damages to state land;

feet in height" within the Conservation District, (2) constructed a road in the Conservation District, and (3) constructed an unauthorized 30 inch pipe or culvert that ran onto state property in the Conservation District. The fourth land use violation identified in the September 2, 2003 Letter is not clearly identified in the BLNR Order.

**20.** HRS § 183C-2 (Supp.2000), provided at the time of the violation, as it does now, in pertinent part:

"Land Use" means:
(1) The placement or erection of any solid material on land;
(2) The grading, removing, harvesting, dredging, mining, or extraction of any material or natural resource on land;
(3) The subdivision of land; or
(4) The construction, reconstruction, demolition, or alteration of any structure, building, or facility on land.

(2) The BLNR lacks jurisdiction over grading activities outside the conservation district;

(3) Appellant did not receive notice that the violation was "placement of any solid material on land in the form of dumping ... without a permit as required by HAR § 13–5–24 and 13–5–30(b)";

In the first point of error, Pila'a 400 argued that the BLNR Order violated HRS § 91–3 and HRS § 183C–3(3) because it failed to establish any written guidelines for the assessment of environmental damages. Citing *Hawai'i Prince Hotel v. City and County of Honolulu*, 89 Hawai'i 381, 383, 974 P.2d 21, 23 (1999), Pila'a 400 contended that "the methodology for imposing fines and penalties must be clearly established by rule, otherwise the public is unaware of factors critical to the agency's penalty process." Further, Pila'a 400 reasoned that "[a] penalty imposed in the absence of Chapter 91 rulemaking is invalid as arbitrary and capricious."

In response, the DLNR contended that the plain language of HRS § 183C–7(b) authorizes the BLNR to regulate the use of conservation district land and to impose fines for its misuse. In addition, because state land could be damaged in an infinite number of ways that includes any possible removal, diminishing, destruction, or loss in the conservation values, the DLNR argued that it is "impossible to the point of absurdity" to suppose that the BLNR is required to prescribe by rule the exact amount of damage that will be levied, citing *Coney v. Lihue Plantation Co.*, 39 Haw. 129 (1951). The DLNR further explained that the appropriate standard for the assessment of the damage amount was applied in this case.

In its second point of error, Pila'a 400 argued that the BLNR did not have jurisdiction because the grading activities took place outside the Conservation District. Citing the BLNR's findings of fact, Pila'a 400 contended that the sedimentation events resulted in mudflow from the Property into the Conservation District and that the source of the sediment was outside of the Conservation District. Pila'a 400 argued that HRS § 183C limits the agency's authority to land use activities on Conservation District land.

In response, the DLNR argued that the dumping of mud and dirt onto Conservation District land is a "land use" under HRS § 183C and that the "source" of the mud was not relevant. In addition, the DLNR contended that whether the dumping was intentional was not relevant to the statute.

In its third point of error, Pila'a 400 argued that the Contested Case Hearing Notice did not provide adequate notice that the alleged land use violation was "unpermitted marine construction" under HAR § 13–5–24. Pila'a 400 contended that HRS § 91–9(b) requires an agency to give notice of the "particular sections of the statutes and rules involved" and that the absence of specific notice of HAR § 13–5–24 denied Pila'a 400 due process.

In response, the DLNR argued that Pila'a 400 received adequate notice in compliance with HRS § 91–9(b) because the written notice referred to the statutes and rules involved by chapter. The DLNR emphasized that "[t]he notice references Haw.Rev.Stat. chapter 183C and HAR § 13–5" and "nothing more was required by section 91–9(b)." [21]

On December 4, 2006, the circuit court issued its Findings of Fact, Conclusions of Law, and Order affirming the BLNR Order. The circuit court determined, in relevant part that:

FINDINGS OF FACT

. . . .

27. [Pila'a 400] did not challenge any of the BLNR's findings of fact.

. . .

21. On March 9, 2006, the Environmental Protection Agency and the Hawai'i Department of Health filed a complaint in the United States District Court for the District of Hawai'i against the Pflueger Parties, alleging violations of state and federal law and seeking damages and injunctive relief. On June 16, 2006, the U.S. District Court approved a consent decree resolving the claims. As part of the consent decree, the Pflueger Parties paid civil penalties and agreed to undertake remedial measures, but denied liability. On July 24 and August 17, 2006, Pflueger Parties filed motions with the circuit court seeking summary judgment and dismissal based on the consent decree. The circuit court denied both motions on October 23, 2006.

CONCLUSIONS OF LAW

. . . .

6. The [Contested Case Hearing Notice] was adequate and sufficient to satisfy the notice requirements of HRS Chapter 91. The notice refers to the statute and the rules involved by chapter. Appellant was aware of the general issues.

. . .

7. Due Process is satisfied if the parties are sufficiently apprised of the nature of the proceeding as set forth in [HRS] § 91-9(b). [Pila'a 400] received such notice, so there is no unfair surprise

. . . .

8. [Pila'a 400]'s argument that the administrative proceeding is invalid because the notice does not refer to "marine construction," is without merit because the BLNR did not base its Final Decision on "marine construction."

. . .

12. Because damages to state land, as well as the nature of the state land itself, can vary, it would be impossible to devise a single rule that prescribes the methodology for quantifying damages. Therefore, determination of the appropriate amount of damages must be on a case by case basis and was properly determined through a quasi-judicial process before the BLNR.

Accordingly, the circuit court affirmed the BLNR Order. Final judgment was entered on December 26, 2006.

## F.

On January 9, 2007, Pila'a 400 filed a timely appeal to the ICA. Pila'a 400 asserted that the circuit court erred in affirming the BLNR order for the following reasons, inter alia:

(a) [the BLNR Order] exceeded the statutory authority and jurisdiction of the agency under HRS § 183C-3(7) because the subject grading activity occurred outside of the conservation district;

(b) [the BLNR Order] violated HRS § 91-9(b), and [Pila'a 400]'s due process rights insofar as [Pila'a 400] did not receive notice of the nature of the land use violation;

(c) [the BLNR Order] violated HRS § 91-3 and HRS § 183C-3(3), as the DLNR and the [BLNR] failed to adopt rules for calculating and assessing environmental damages to state land;

*Pila'a 400 LLC v. Bd. of Land & Natural Res.*, No. 28358, 2012 WL 6680477 at *5 (App. Dec. 21, 2012) (mem.) (hereinafter "*ICA Op.*").

As to the first point of error, Pila'a 400 maintained that the BLNR lacked jurisdiction because the alleged land use violations occurred outside of the conservation district. Citing to the BLNR's findings of fact, Pila'a 400 contended that the sedimentation events resulted in mudflow from the Property *into* the Conservation District and that the source of the sediment was outside of the Conservation District. Pila'a 400 argued that HRS § 183C limits the agency's authority to land use activities *on* Conservation District land, and therefore the land use activities were outside the BLNR's jurisdiction.

The ICA held that the BLNR properly exercised jurisdiction for two reasons: (1) at least some of the unpermitted grading activity occurred within the Conservation District, and (2) the unpermitted placement of solid material on conservation land is itself a land use violation directly under the BLNR's jurisdiction. *ICA Op.* at *6. The ICA emphasized that the origin of the fill material was irrelevant, and it was the act of dumping that brought this action under the BLNR's jurisdiction. *Id.*

The ICA also held that the BLNR was not barred by any authority from considering additional land use violations beyond the four land use violations that were identified in the September 2, 2003 Letter. *Id.* The ICA reasoned:

[Pila'a 400] had reason to know that damage to the beach, bay and reef caused by the mud flow from the Property was unquestionably of concern and the reason for DLNR's enforcement action. To the extent [Pila'a 400] argues that it was unaware damage caused by soil runoff was at issue, we conclude that argument is unsupported by the record.

*Id.* at \*6–7. Therefore, because Pila'a 400 had adequate notice that damage to the reef and bay caused by the mudflow was a central issue at the contested case hearing, Pila'a 400 could not later argue that the BLNR was limited to the four land use violations originally identified and lacked jurisdiction over the mudflow and resultant damage. *Id.*

In its second point, Pila'a 400 argued the Contested Case Hearing Notice provided by the BLNR was insufficient under HRS § 91–9, and as a result of the insufficiency of the notice, it had been denied due process. Pila'a 400 alleged the Contested Case Hearing Notice was deficient in that it did not include a specific citation to HAR § 13–5–24 and did not contain an explicit statement in plain language of the issues involved and facts alleged.

The ICA concluded that the Contested Case Hearing Notice provided by the BLNR was sufficient. *ICA Op.* at \*7. First, the ICA concluded that Pila'a 400 had waived this challenge on appeal because it did not raise the issue of improper notice during the contested case hearing. *Id.* Second, the ICA observed that, contrary to the assertion of Pila'a 400, the Contested Case Hearing Notice did contain an explicit statement of the essential issues, "the alleged damage to State land(s) and natural resources due to excessive sedimentation from Pila'a [400]'s land." *Id.* The ICA reviewed the record and concluded that it was "clear" that Pila'a 400 was "aware of the general issue" and "sufficiently apprised of the nature of the proceeding." *Id.* at \*8. The ICA found that as Pila'a 400 "itself identified the matters to be considered in the contested case hearing as including the statutory basis for the assessment of damage, it cannot claim to be surprised by a hearing that involved DLNR's arguments regarding the basis for the assessment."

In regard to its third point, Pila'a 400 argued that the BLNR failed to adopt rules that established a uniform methodology for assessing environmental damages before imposing a $3,963,000 penalty on Pila'a 400.

The ICA concluded that the BLNR and DLNR were not required to engage in rule-making in this case. *ICA Op.* at \*8. The ICA, citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), reasoned that it would be impossible to create a single formula that could be used to assess the damage to state Conservation District land under all possible circumstances:

> Due to the infinitely diverse nature of the lands and resources, and the myriad of ways damage may occur on such lands and resources, measuring value and value lost must be on a case-by-case basis, especially when of the magnitude under the circumstances presented here. Devising and imposing a single formulaic methodology for assessing penalties would be impracticable.

*ICA Op.* at \*10. The ICA held that the circuit court did not err in affirming the BLNR's order.[22] *ICA Op.* at \*18.

### G.

In its application for writ of certiorari (Application), Pila'a 400 presents the following questions for review:

A. Did the ICA commit grave error when it found that neither the [BLNR] nor the DLNR are required to engage in rule-making, under HRS § 183C–3 and § 91–3, to adopt a reasonable and just methodology for assessing damage to natural resources?

B. Did the ICA commit grave error when it found that the [BLNR] had jurisdiction, under HRS § 183C–3, to institute an enforcement action for grading activities outside of the Conservation District?

C. Did the ICA commit grave error when it found that [Pila'a 400] was afforded an opportunity for hearing after reasonable notice, under HRS § 91–9, where the record is undisputed that the DLNR failed to give [Pila'a 400] notice of the particular sections of the statute and rules involved in the enforcement action?

22. Judge Wilson wrote separately to emphasize that BLNR did not err in including intrinsic value in its calculation of the damages to State land at Pila'a Bay and reef.

In the first question presented, Pila'a 400 contends that the ICA's determination that the BLNR and the DLNR were not required to engage in rule-making is grave error. Pila'a 400 argues first that the ICA's conclusion ignores the plain language of HRS § 183C–3(3), which states that the BLNR "shall" engage in rule-making under the Hawaii Administrative Procedures Act (HAPA) rule-making procedures. Second, Pila'a 400 contends that where quasi-judicial adjudication encompasses concerns that transcend those of individual litigants and implicates matters of administrative policy, rule-making procedures should be followed. Third, citing to *Hawai'i Prince Hotel v. City and County of Honolulu*, 89 Hawai'i 381, 974 P.2d 21 (1999), Pila'a 400 argues that a methodology to determine value is a "rule" within the meaning of HRS § 91–1(4) and requires HAPA rule-making procedures. Pila'a 400 concludes that in the absence of such guiding rules, the DLNR's assessment was arbitrary and subjective.

In response, the DLNR argues that, under HRS § 183C–7(b), the legislature specifically authorized and directed the BLNR to include damages to state land when assessing fines. The DLNR maintains that determining damages to Pila'a Bay and reef is not an exact science and that there are no settled or infallible rules or criteria by which to ascertain damages. The DLNR argues Pila'a 400 can only challenge its findings as provided for in HRS § 91–14(g),[23] and because Pila'a 400 does not contend that the BLNR's findings are clearly erroneous or unsupported by substantial evidence, Pila'a 400's argument in regards to required rule-making is without merit.

In its second question presented, Pila'a 400 argues that the ICA committed grave error when it failed to articulate a legal basis for the DLNR's jurisdiction over the agency enforcement action. Specifically, Pila'a 400 argues that although the enforcement action involved land use violations within the Conservation District, the source of the sediment that went into the ocean was from grading "outside" of the Conservation District and therefore beyond the jurisdiction of the BLNR.

In response, the DLNR observes that Pila'a 400 does not dispute that the BLNR assessed a fine for damage to state owned property in the Conservation District. The DLNR contends that Pila'a 400 is not relieved of liability simply because the sediment that caused the damage was a result of activity outside of the Conservation District. In addition, the DLNR argues that Pila'a 400 was clearly informed throughout the contested case hearing—including a site visit and 13 days of testimony—that the proceedings related to damages to State land.

In the third point of error, Pila'a 400 argues that the ICA committed grievous error when it held that the notice requirements of HRS § 91–9(b) were satisfied. Specifically, Pila'a 400 contends that the notice it received pursuant to HRS § 91–9 was insufficient in that it failed to cite specifically to HAR § 13–5–24, although the BLNR Order assessed damages based on the placement of fill material on submerged land as prohibited by that section.

In response, the DLNR argues that the requirements of HRS § 91–9 were met because the statutes and rules involved were referred to by chapter. The DLNR contends that nothing more was required, and if Pila'a 400 needed more information to effectively prepare its case, the proper remedy was to ask for a bill of particulars at that time rather than to raise the issue on appeal. Because Pila'a 400 failed to challenge the notice in a timely manner, it cannot argue that notice was inadequate.

## II.

■ The review of a circuit court's decision regarding its review of an administrative agency's decision is a secondary appeal. *Haw. Teamsters & Allied Workers, Local 966 v. Dep't of Labor & Indus. Relations*, 110 Hawai'i 259, 265, 132 P.3d 368, 374 (2006). In a secondary appeal, "Hawai'i appellate

---

**23.** HRS § 91–14(g) sets forth the standard for judicial review of an agency. HRS § 91–14(g)(5) sets out a "clearly erroneous" standard for judi-

cial review of administrative findings of fact and mixed questions of fact and law. *See* section III, *infra*.

courts apply the same standard of review as that applied upon primary review by the circuit court." *AlohaCare v. Ito,* 126 Hawai'i 326, 341, 271 P.3d 621, 636 (2012) (quoting *Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations,* 70 Haw. 72, 80, 762 P.2d 796, 800–01 (1988)).

The applicable standard of review for administrative appeals is set forth in HRS § 91–14(g), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g). *See Save Diamond Head Waters LLC. v. Hans Hedemann Surf, Inc.,* 121 Hawai'i 16, 24, 211 P.3d 74, 82 (2009).

■ Conclusions of law are reviewed *de novo,* pursuant to subsections (1), (2) and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under the clearly erroneous standard, pursuant to subsection (5); and an agency's exercise of discretion is reviewed under the arbitrary and capricious standard, pursuant to subsection (6). *Id.* Mixed questions of law and fact are " 'reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.' " *Id.* at 25, 211 P.3d at 83 (quoting *Del Monte Fresh Produce (Hawaii), Inc. v. Int'l Longshore & Warehouse Union,* 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006)).

III.

A.

■ Pila'a 400 contends that because the BLNR and the DLNR only have jurisdiction to "enforce land use regulations on conservation district lands," BLNR did not have jurisdiction over Pila'a 400's actions or the resultant damages. Specifically, Pila'a 400 maintains that the damage to Pila'a Bay resulted from grading activities conducted outside of the Conservation District, causing the flow of sediment from outside of the Conservation District onto the beach and into the bay. Consequently, Pila'a 400 concludes BLNR and DLNR have no jurisdiction over Pila'a 400's land use activities.

■ In general, the jurisdiction of an agency is created by statute. That jurisdiction is "limited by the terms of the governing statute." *Nihi Lewa, Inc. v. Dep't of Budget & Fiscal Servs.,* 103 Hawai'i 163, 170, 80 P.3d 984, 991 (2003)(Acoba, J., dissenting) (citing *Ogle Cnty. Bd. v. Pollution Control Bd.,* 272 Ill.App.3d 184, 208 Ill.Dec. 489, 649 N.E.2d 545, 551 (1995)).

The powers and duties of the BLNR and DLNR with respect to Conservation District lands are set forth in HRS § 183C–3. HRS § 183C–3 states, in relevant part, as follows:

The board and department shall:

. . . .

(3) Adopt rules, in compliance with chapter 91 which shall have the force and effect of law;

. . . .

(7) Establish and enforce land use regulations on conservation district lands including the collection of fines for violations of land use and terms and conditions of permits issued by the department.

HRS § 183C–3 (2011). In accordance with this directive, the BLNR adopted HAR § 13–5–30(b), which specifies that "[u]nless provided for in this chapter, land uses shall not be undertaken in the conservation district."

In this case, the BLNR's enforcement action was based on excessive sedimentation within the Conservation District. The Con-

tested Case Hearing Notice clearly defined the proceedings as "an enforcement action involving the alleged damages to State land(s) and natural resources due to excessive sedimentation at Pila'a." (Emphasis added).

The BLNR had jurisdiction in this case first because the September 2, 2003 Letter identified land use violations "in four (4) instances within the conservation district." (Emphasis added). Those land use violations were not disputed by Pila'a 400. Therefore, the BLNR had proper jurisdiction in the contested case hearing to adjudicate damages that resulted from land use violations that occurred within the district.

Second, the BLNR's jurisdiction in the contested case hearing was derived not only from the four land use violations cited in the September 2, 2003 Letter, but also on the undisputed fact that, on November 26, 2001, sediment from the Property flowed into Pila'a Bay and onto the reef. Pila'a Bay and reef are conservation district lands, and the dumping of soil onto conservation land falls within the definition of 'land use' in HRS § 183C-2. The BLNR determined that

> [o]n November 26, 2001 … rain and erosion caused a portion of the recently graded and filled hillside on the Property to slump downhill from the Property, across Pila'a Beach and into Pila'a Bay … Additional sedimentation events occurred in December 2001 and early 2002, in each case resulting in mudflow from the Property into the conservation district.

(Emphases added). Further, the BLNR found "[t]he 'illegal activity' that was conducted on conservation land (including submerged land) was dumping or allowing to be dumped a large unknown quantity of dirt and mud without a permit as required by HAR §§ 13-5-24 and 13-5-30(b)." The circuit court similarly found that "mud and sediment [ ] was placed onto state land following the rainfall on November 26, 2001." None of these findings were challenged by Pila'a 400. Therefore, because mud and sediment were placed on state conservation district land, the

BLNR had jurisdiction over any violations that arose out of that placement.

Pila'a 400 argues that the BLNR did not have jurisdiction because "the source of the sediment that went in the ocean was from grading outside of the conservation district, beyond the jurisdictional reach of DLNR." However, the definition of land use refers to the placement of "any solid material" on land without regard to the source of the material. HRS § 183C-2; HAR § 13-5-2. As the ICA explained, "Nothing in the plain language of HRS § 183C-3(2) or HAR § 13-5-2 requires that the soil or other material placed on Conservation District land originate from Conservation District land as well." *ICA Op.* at *6.

Therefore, the ICA correctly determined that the BLNR had jurisdiction, pursuant to HRS § 183C-3(7), to institute a proceeding to "enforce land use regulations on conservation district lands" in a case "involving the alleged damages to State land(s) and natural resources due to excessive sedimentation at Pila'a." HRS § 183C-3(7).

**B.**

■ Pila'a 400 contends that HRS § 183C-3 requires the BLNR and the DLNR to engage in rule-making to adopt a standardized methodology for the valuation of damages to natural resources. Pila'a 400 contends that because the BLNR adopted a new methodology to determine value, this methodology constitutes a "rule" within the meaning of HRS § 91-1(4) (1993).

Although HRS § 183C-3 authorizes the BLNR and the DLNR to adopt rules in accordance with Chapter 91, neither HRS § 183C-3(3) nor HRS § 91-3 required the BLNR or the DLNR to engage in rule-making. As noted above, HRS § 183C-3 grants the BLNR and the DLNR the authority to "adopt rules" and "establish and enforce land use regulations on conservation district lands".[24] HRS § 183C-3(5),(7).

The legislature also granted the BLNR authority to adjudicate on a case-to-case ba-

---

**24.** In the context of an agency, a rule is a "statement of general or particular applicability and future effect that implements, interprets, or pre-

scribes law or policy or describes the organization, procedure or practice requirements of any agency." HRS § 91-1(4).

sis. Under HRS § 183C–7, if the BLNR finds misuse of conservation district land, the BLNR can impose fines, set forth by the statute, or damages, not limited by statute.[25]

Thus, HRS § 183C–3 contains only a general mandate that the BLNR and the DLNR adopt rules regarding the regulation of conservation district lands.[26] The BLNR complied with this mandate through the promulgation of HAR chapter 13–5. There is no statutory requirement to enact rules regarding the valuation of damage to reef or valuable marine resources.

Neither were the circumstances under which the BLNR valued the damage to Pila'a Bay and reef circumstances that were appropriate for rule-making. The U.S. Supreme Court has recognized the need for government agencies to proceed at times by general rule and at other times by case-by-case adjudication. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Court reviewed a decision by the Securities and Exchange Commission (SEC) that rejected amendments to a registered corporation's reorganization plan. *Chenery*, 332 U.S. at 199, 67 S.Ct. 1575. The registered corporation argued that without an express standard prohibiting the amendments, the SEC could only "outlaw such profits in future utility organizations; but such a rule would have to be prospective in nature and have no retroactive effect upon the instant situation." *Id.* at 199–200, 67 S.Ct. 1575 (emphasis added). The Court disagreed, holding that agencies are permitted to adjudicate without resorting to rule-making in appropriate situations:

> Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

*Id.* at 202, 67 S.Ct. 1575 (emphasis added).

This court has held that rule-making is inappropriate where an agency lacks experience with a particular problem.

> [P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be resolved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain the power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.

*Application of Hawaiian Elec. Co.*, 81 Hawai'i 459, 468, 918 P.2d 561, 570 (1996)(hereinafter *In re HECO* ) (emphasis added) (quoting *Chenery*, 332 U.S. at 202–03, 67 S.Ct. 1575), *accord In re Water Use Permit Applications*, 94 Hawai'i 97, 170, 9 P.3d 409, 482 (2000) (also quoting *Chenery*, 332 U.S. at 203, 67 S.Ct. 1575); *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct.

---

**25.** At the time of the November 26, 2001 mudslide, HRS § 183C–7 provided that:

> Any person violating this chapter or any rule adopted in accordance with this chapter shall be fined not more than $2,000 in addition to administrative costs and damages to state land. HRS § 183C–7(b)(2001).

**26.** Pila'a 400's reliance on *Aluli v. Lewin*, 73 Haw. 56, 828 P.2d 802 (1992), is therefore misplaced. In *Aluli*, this court held that the Department of Health (DOH) erred in issuing air pollution permits when the agency had not promulgated rules governing the issuance of such

permits. *Id.* at 61, 828 P.2d at 805. The decision was based on the provision of HRS § 342B–32 (Supp.1991), which mandated that " '[t]he director shall refuse to issue the permit unless it ... would be in compliance with the rules of the department and the state ambient air quality standards.' " *Id.* at 57–58, 828 P.2d at 803 (quoting HRS § 342B–32). The *Aluli* court concluded that the DOH could not issue a permit where the statute only authorizes the issuance of a permit in accordance with rules, and the rules had yet to be propagated. *Id.* at 61, 828 P.2d at 805.

1757, 40 L.Ed.2d 134 (1974) (agency judgment to adjudicate on a case-by-case basis rather than create rules is entitled to great weight where a "generalized standard would have ... marginal utility.").

This court has also acknowledged a distinction between the circumstances appropriate for rule-making versus adjudication duties of an agency. In the most general terms, the purpose of rule-making is to govern the future conduct of groups and individuals, not determining damages resulting from past conduct.

> Rule-making is an agency action governing the future conduct either of groups of persons or of a single individual; it is essentially legislative in nature, not only because it operates in the future but also because it is concerned largely with considerations of policy. <u>In rule-making, disciplinary or accusatory elements are absent.</u>

*In re HECO*, 81 Hawai'i at 466, 918 P.2d at 568 (emphasis added) (quoting Note, *"Rule Making," "Adjudication" and Exemptions Under the Administrative Procedure Act*, 95 U. Pa. L.Rev. 621 (1946–47)). *See also Coney v. Lihue Plantation Co.*, 39 Haw. 129, 138–39 (1951) (holding that in a determination of damages, the finder of fact has a right and a duty to draw reasonable and probable inferences from the facts and circumstances in evidence, and in reference to the amount of damages, "the law never insists upon a higher degree of certainty as to the amount of damages than the nature of the case admits, and that where ... the fact of damage is established, a more liberal rule is allowed in determining the amount.")

Setting a general standard in this situation would be impracticable to define by general rule because the November 26, 2001 mudflow and damage to the reef was an "unforeseeable situation" and "so specialized and varying in nature so as to be impossible of capture within the boundaries of a general rule." *Chenery*, 332 U.S. at 202, 67 S.Ct. 1575; *In re HECO*, 81 Hawai'i at 468, 918 P.2d at 570. Conservation district lands are unique in that they "contain important natural resources es-

sential to the preservation of the State's fragile natural ecosystems...." HRS § 183C–1 (2011). The DLNR is tasked with the duty of "conserving, protecting, and preserving the important natural and cultural resources of the State." HAR § 13–5–1. The elements of fragile ecosystems, cultural resources and natural beauty combine to make an assessment of damage to State land in one conservation district inapplicable in other conservation districts. As the ICA concluded:

> Assessing damage to Conservation District lands, which "contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply[,]" HRS § 183C–1 (2011), is a complex undertaking involving <u>numerous and variable components,</u> often unique to a particular situation.... <u>Devising and imposing a single formulaic methodology for assessing penalties would be impracticable.</u>

*ICA Op.* at \*10 (Emphases added). Therefore, the BLNR was not required to engage in rule-making to adopt a standardized methodology for valuation of damages to conservation lands before making a valuation of damage to land in the Conservation District resulting from excessive sedimentation.

Pila'a 400 relies on *Hawai'i Prince Hotel Waikiki Corp. v. City and County Of Honolulu*, 89 Hawai'i 381, 974 P.2d 21 (1999). In *Hawai'i Prince*, a taxpayer appealed the City of Honolulu's tax assessment for the taxpayer's golf course. 89 Hawai'i at 383, 974 P.2d at 23. The taxpayer objected to the city appraiser's methodology for calculating imparted value based on standards "in his head." [27] *Id.* at 391, 974 P.2d at 31. The court held that the city appraiser's unwritten methodology led to inequality in value assessments and "was clearly a 'rule' within the meaning of HRS § 91–1(4)" such that rule-making was required. *Id.* at 392–93, 974 P.2d at 32–33.

The calculation of imparted value in *Hawai'i Prince* significantly differs from the calculation of damages in the present case.

---

**27.** "Imparted value" is the effect of the value of a property on the surrounding land, and is deducted from assessed value, reducing tax liability.

*Hawai'i Prince*, 89 Hawai'i at 386, 389–91, 974 P.2d at 26, 29–31.

In *Hawai'i Prince*, the city appraiser routinely calculated imparted value. *See Hawai'i Prince*, 89 Hawai'i at 391, 974 P.2d at 32. Consequently, the appraiser's future use of the imparted value methodology was clearly foreseeable. Here, as noted above, there is no routine assessment of an unforeseeable event involving "numerous and variable components" resulting in extensive environmental damage to an irreplaceable resource like Pila'a's Bay and reef.

Second, in *Hawai'i Prince*, the city appraiser used an unwritten methodology in which he personally weighed multiple factors that could predictably increase the value of property surrounding a golf course. *Id.* at 392–93, 974 P.2d at 32–33. In contrast, the BLNR's calculation of damages was not the result of an unwritten methodology dependent on the discretion of a single individual. Instead, the BLNR's determination of damages was based on the expert testimony of scientists and economists presented by both Pila'a 400 and the DLNR. The testimony of these experts was supported by no less than six scientific studies—four entered into evidence by the DLNR and two entered into evidence by Pila'a 400—that examined the unique and irreplaceable value of Pila'a Bay and reef.

Finally, Pila'a 400's reliance on *Hawai'i Prince* is misplaced because assessment of the imparted value of a golf course cannot be compared to a unique resource like Pila'a reef. "Natural beauty, the value of nature, is necessarily intrinsic. It is not susceptible to valuation based on price in the marketplace. The value of Hawai'i's forests is not the market value of its board feet. The value of Hawai'i's coral reefs is different than the value of its harvest." *ICA Op.* at *18 (Wilson, J., concurring).[28]

28. We note that Pila'a 400 suggests that the damage award was arbitrary, without directly arguing this point. However, the BLNR's damage assessment was supported by findings and conclusions that resulted from over 13 days of testimony by multiple experts. The BLNR made specific findings as to the value of the damage. Therefore, the assessment of damages provided for in the BLNR Order was not arbitrary or capricious.

C.

On October 3, 2003, the BLNR published the Contested Case Hearing Notice, in which it specifically stated:

The Board of Land and Natural Resources (BLNR), State of Hawaii will conduct a contested case hearing on DLNR File No. KA–04–02 regarding an enforcement action involving the alleged damage to State land(s) and natural resources <u>due to excessive sedimentation</u> at Pila'a, District of Hanalei, Island of Kauai, <u>seaward</u> of TMK: 5–1–4:8 (por). The hearing will be held pursuant to *Chapters 91 and 183C Hawaii Revised Statutes*, and *Chapters 13–1 and 13–5*, Hawaii Administrative Rules (HAR).

(Emphases added).

Pila'a 400 contends in its Application that the Contested Case Hearing Notice was not compliant with HRS § 91–9(b) because the notice did not cite to HAR § 13–5–24.[29] HRS § 91–9 provided, in relevant part, as follows:

(a) In any contested case, the parties shall be afforded an opportunity for hearing after reasonable notice.

(b) The notice shall include a statement of:

. . . .

(3) The particular sections of the statutes and rules involved;

(4) An explicit statement in plain language of the issues involved and the facts alleged by the agency in support thereof; provided that if the agency is unable to state such issues and facts in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved, and thereafter upon

29. The ICA also stated in its opinion that Pila'a 400 "failed to preserve this challenge to [HRS § 91–9] notice," because Pila'a 400 did not, in its written supplement to its oral request for a contested case hearing, state that "it did not know which specific provisions were being relied on." *ICA Op.* at *18. However, the written request was filed on August 29, 2003, prior to the Contested Case Hearing Notice, issued on October 3, 2013.

application a bill of particulars shall be furnished;

HRS § 91–9 (1984).

Based on the asserted lack of notice to the particular sections involved in the contested case hearing, Pila'a 400 further contends that:

Pila'a never received HRS § 91–9 notice that the contested case sought damages based on alleged land use violations of "placement or erection of any solid material" on submerged land or unpermitted marine construction under "HAR § 13–5–24."

Thus, Pila'a 400 claims it was unaware that the BLNR sought damages based on alleged land use violations for placement of solid material on submerged land and, consequently, its defense at the contested case hearing "was based on the Notice and Order that Pila'a 400 engaged in unpermitted 'grading, grubbing, cutting, and culvert construction'" within the conservation district.

Pila'a 400's argument that it was unaware of the general issues to be determined at the contested case hearing is patently flawed, both procedurally and substantively. It is procedurally flawed because Pila'a 400 has repeatedly waived this issue. The circuit court specifically found that "[Pila'a 400] was aware of the general issues," and "[d]ue process is satisfied if the parties are sufficiently apprised of the nature of the proceeding.... [Pila'a 400] received such notice." These findings and conclusions were unchallenged on appeal.

Pila'a 400 made a similar argument before the ICA that it was uninformed as to the issues that would be presented at the contested case hearing. The ICA held that Pila'a 400 did not appeal the circuit court's findings to the ICA. See ICA Op. at *2, n. 10. Additionally, the ICA reviewed the record and found that "it is clear ... that [Pila'a 400] was 'aware of the general issues' and

'sufficiently apprised of the nature of the proceeding,' as the circuit court concluded, well before the contested case hearing." ICA Op. at 19. In its application to this court, Pila'a 400 did not contend that the ICA gravely erred with respect to these findings.

As Pila'a 400 does not directly challenge these findings in its Application, they are binding on this court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 125, 839 P.2d 10, 31 (1992) (citing Hawai'i Rules of Appellate Procedure Rule 28(b)(4)(C) (holding that a conclusion of law not challenged on appeal is binding)); *Okada Trucking Co., Ltd. v. Bd. of Water Supply*, 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002) (unchallenged findings of fact are binding on the appellate court).

Therefore, Pila'a 400 has conceded that it was "aware of the general issues" to be determined at the contested case hearing and it was "sufficiently apprised of the nature of the proceeding" such that the BLNR sought damages based on placement of solid material on submerged land.[30] Nonetheless, we consider Pila'a 400's awareness of the issues involved in the contested case hearing only insofar as it relates to Pila'a 400's claim of lack of notice to the "particular sections of the statutes and rules involved" under HRS § 91–9.

i.

As the ICA and the circuit court concluded, it is clear from the record that prior to the contested case hearing, Pila'a 400 was fully aware of the issues that would be addressed at that hearing. From the date of the Second Notice and Order on June 20, 2002, Pila'a 400 had notice of the significant damage to the reef that it was alleged to have caused and its potential liability. In the Second Notice and Order, the BLNR discussed the damage to the bay and reef and

---

**30.** The Dissent characterizes this statement as "a patent misrepresentation of the proceedings in this case[.]" Dissent at 278, 320 P.3d at 943. However, Pila'a 400 did not claim it was unaware of the general issues to the circuit court, nor contest the circuit court's conclusion in its appeal to the ICA that Pila'a 400 was generally aware of the nature of the proceedings. In its Application to this court, Pila'a 400 stated "[t]he

ICA's reference to [Pila'a 400]'s awareness of the 'general issues' ... suggests superficial compliance with the HAPA notice statute meets due process protections[.]" Pila'a 400 therefore contends that despite its general awareness, the notice was insufficient for due process protections; not that it was unaware of the general issues. In oral argument, counsel for Pila'a 400 also con-

informed Pflueger Properties that: "The matter of unauthorized work at Pila'a Bay will be presented to the [BLNR] .... the landowner should be made aware of the possibility of the imposition of the requirement to conduct complete land restoration and long term monitoring." The same language was repeated in the First and Second Implementation Order, dated August 22, 2002 and November 20, 2002, respectively.

Pila'a 400 was informed of its potential liability resulting from BLNR's allegations of damage to the reef and commissioned multiple expert reports to refute those allegations. The first study, completed in February 2003, was entitled "Preliminary Sediment Runoff Analysis for Pflueger Property Restoration." A second study, completed in March 2003, was entitled "Ecology of the Reef Ecosystem of Pila'a, Kauai and Analysis of Alleged Environmental Impacts Associated with Recent Sediment Run–Off."

It is clear that leading up to the Public Meeting, DLNR's allegations regarding the extensive damage to the reef caused by sedimentation and Pila'a 400's potential liability was to be a central, if not the primary, issue at the Public Meeting. At the August 22 Public Meeting, the DLNR submitted the Staff Report, entitled, in part, "Damages to State Land and Natural Resources due to Excessive Sedimentation at Pila'a. . . ." The contents of the Staff Report included a detailed analysis of the damage to the marine environment, considered the long-term remediation of the reef, and suggested fines for violations and assessments for administrative costs. The Staff Report also recommended a significant $5,830,000 assessment for "damage[s] to state land and natural resources stemming from the unauthorized land uses." Indisputably, the proposed financial assessment would have informed Pila'a 400 of its potential liability on the issue of the significant damage to the reef.

In the Written Hearing Request, Pila'a 400 acknowledged that the issue to be determined by the contested case hearing directly concerned damage to the reef caused by sedimentation from the November 26, 2001

mudflow. The request stated: "The matter being considered by the [BLNR] concerns alleged damage to the reef flat and near-shore marine environment stemming from grading activities in the conservative [sic] district which allegedly resulted in discharges of sediment. . . ." (Emphasis added).

This characterization was echoed by the DLNR in its Statement of the Issues of the contested case hearing: "The only issue in this contested case proceeding is the determination of the amount of damages to be assessed against the Pflueger Parties for damages to the beach, reef, and marine environment . . . which were largely the result of excessive sediment."

In its Responsive Statement of the Issues, Pila'a 400 again made it clear it understood the central issues to be determined at the hearing were issues involving the damage to the reef caused by excessive sedimentation. In it, Pila'a 400 contested the damage to Pila'a Bay and reef, the sources and historic patterns of sedimentation into Pila'a Bay, the causation as to the alleged damage to the bay and reef, the scope and extent of the alleged damage, and the amount of alleged damage that was directly caused by Pila'a 400, as opposed to other factors.

Based on the record, it is manifest that prior to the contested case hearing Pila'a 400 was fully apprised that the issues to be determined at the contested case hearing were the nature of damages to the reef at Pila'a Bay, the extent of those damages caused by mudflows resulting from Pila'a 400's unauthorized work, and the amount of the damage assessment. During the 13–day hearing, both sides presented expert and kama'aina testimony and exhibits regarding the impact of the mud and sediment on the bay, reef, flora and fauna, and human activities, as well as the potential economic value of that impact.

In oral argument, the question of knowledge and notice was addressed by counsel for Pila'a 400. In response to a question as to whether Pila'a 400 had filed a bill of particulars,[31] counsel conceded that it had not and

ceded its awareness of the general issues. *See* Section III.C.i.

**31.** HRS § 91–9(b)(4) (1984) prescribes:

An explicit statement in plain language of the issues involved and the facts alleged by the

then stated "[e]verybody knew this was about mud going on the beach and into the nearshore reef." [32] (Emphasis added). It is unequivocal that Pila'a 400 was fully informed that the core issue to be determined at the contested case hearing was the damage to the reef caused by sedimentation.

ii.

▇▇ The Contested Case Hearing Notice did not fail to provide notice, under HRS § 91–9(b)(3), for lack of a citation to HAR § 13–5–24. The notice specifically informed Pila'a 400 that (1) the BLNR would conduct a contested case hearing (2) regarding an enforcement action involving the alleged damage to State land(s) and natural resources (3) due to excessive sedimentation at Pila'a Bay, (4) seaward of the Property, and (5) the hearing would be held pursuant to HRS Chapters 91 and 183C and HAR Chapters 13–1 and 13–5.[33] The Contested Case Notice satisfied the requirements of HRS § 91–9(b) for the following reasons.

First, HRS § 91–9(b)(3) provides that a contested case hearing notice "shall include a statement of [t]he particular sections of the statutes and rules involved[.]" (Emphases added). The word "involved" has a broad and inclusive definition, meaning "affected" or "implicated." *Webster's Third New Int'l Dictionary* 1191 (1993). HRS § 91–9(b)(3) enumerates the plural form of the words "sections," "statutes," and "rules" with the

word "involved," indicating that a contested case hearing notice may include references to multiple statutes and rules implicated in or affected by the contested case hearing.

Of the forty-five individual sections that comprise HAR Chapter 13–5, approximately twenty-three sections may fairly be said to have been "involved" in the contested case hearing.[34] HRS § 91–9 does not preclude the citation of an entire chapter when many sections within a single chapter are "involved" in a given matter, or indicate a specific format to use in referencing sections of the statutes or rules involved. Significantly, Pila'a 400's argument is not that multiple sections in HAR § 13–5 were not "involved" in the contested case hearing; Pila'a 400's argument is instead that it was not given adequate notice of HAR § 13–5–24 because this section was not individually cited in the BLNR's published notice. Under the circumstances of this case, a citation to every section of HAR chapter 13–5 would have been largely redundant, as the majority of the sections comprising the chapter may be said to have been "involved" in the contested case hearing.

Second, the BLNR did not base their findings on a "violation" of HAR § 13–5–24 or on "marine construction," as Pila'a 400 maintains.[35] The BLNR Order states: "The violation was the placement of any solid material on land in the form of dumping or allowing to be put on conservation land (including

34. The subject matter of these provisions was referenced either directly or indirectly in the BLNR's uncontested Findings of Facts (FOF) and Conclusions of Law (COL). "Involved" sections include: HAR § 13–5–1 (general purpose for regulating land use in the conservation district), §§ 2, 10, 12, 13 (defining terms); §§ 11, 14, 15 (defining subzones); § 6 (penalties provided by HRS § 183C); § 16 (application for new subzone, rezone existing subzone, or change subzone boundary or uses); § 17 (permit requirements); §§ 22–25 (permit requirements and land uses in the General, Protected, Limited and Resource subzones); §§ 30, 33–35 (prohibiting unpermitted land use); § 38 (review and approval of site plans); § 39 (submission and approval of plans); § 40 (public hearings); and § 42 (provides that any land use permitted within conservation district is subject to standard conditions).

35. The Dissent makes a similar error. Dissent at 276, 278, 280–81, 281, 320 P.3d at 941, 943, 945–46, 946.

agency in support thereof; provided that [I]f the agency is unable to state [ ] issues and facts in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved, and thereafter upon application a bill of particulars shall be furnished. (Emphasis added).

32. Oral Argument, Hawai'i Supreme Court, at 19:25 (Jun. 25, 2013) available at http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc28358.html.

33. The Dissent contends that the notice is "broad" and "vague," because the notice states the action would be "pursuant to all of the chapters ... regarding conservation district lands." Dissent at 279, 320 P.3d at 944. Chapter 13–5 is the only chapter in HAR Title 13 regarding conservation lands, and 183C is the only chapter in HRS regarding conservation lands.

submerged land) of a large unknown amount of dirt and sediment." The BLNR did <u>not</u> adopt the proposed finding of the DLNR and did not define the mudflow as an unpermitted marine construction.

Nevertheless, Pila'a 400 seizes on the BLNR's conclusion that the placement of solid material on conservation land was done "without a permit as required by HAR §§ 13–5–24 and 13–5–30(b)," to claim that it lacked notice of an alleged violation for "unpermitted marine construction." However, HAR § 13–5–24 and 13–5–30(b) are provisions that prohibit land use in the conservation district without a permit. The placement of solid material on the land constitutes a "land use" under HAR § 13–5–2. Therefore, the BLNR's reference to "without a permit" was merely a way of stating that the November 26, 2001 mudflow and subsequent sedimentation were land uses that were completely unauthorized.

The BLNR did not identify the type of permit that Pila'a 400 failed to obtain because there was no dispute that Pila'a 400 did not have <u>any</u> permits for the mudflow. Pila'a 400 has not challenged the BLNR's finding that "Pila'a 400 did not have <u>any permit</u> from the DLNR or the BLNR authorizing or allowing it to discharge mud onto, build on, grade, fill, or in any way use, alter, or affect land (including submerged land) in the conservation district." (Emphasis added). Furthermore, Pila'a 400 has not challenged the BLNR's finding that "[n]o discharges into the ocean were authorized by state or federal law." Consequently, no permit could have been obtained to allow the excessive sediment to flow onto conservation lands.

Third, despite Pila'a 400's contention, the Contested Case Hearing Notice provides an implicit reference to § 13–5–24 because "excessive sedimentation" could <u>only</u> be a reference to that section. "Sedimentation" is the deposition or accumulation of sediment.[36] "Sediment" is the matter that settles to the

bottom of a liquid, or mineral or organic matter deposited by water.[37] Therefore, sedimentation in its ordinary and common meaning means the deposit or accumulation of solid material in water. In conjunction with the statement that the sedimentation was "seaward," the Contested Case Hearing Notice provides notice that the "particular sections of the statutes and rules involved" the filling or placement of solid material in the ocean within Chapter 13–5.

There is <u>only</u> one section of HAR, Chapter 13–5, that involves filling or placement of solid material in the ocean. HAR § 13–5–24 addresses "dredging, filling, or construction on submerged lands. . . ." Placing solid material, or filling, on submerged lands is not referred to in any other section of HAR Chapter 13–5, and thus there was no other section to which "excessive sedimentation" could have referred to. Therefore, the reference to "excessive sedimentation" together with the citation to HAR § 13–5 was a "statement of . . . the particular sections of . . . the rules involved."

Fourth, this court and the ICA have found that in determining the adequacy of notice of a contested case hearing, the record of communications between the agency and the interested person must be considered. In *Chang v. Planning Commission of the County of Maui*, 64 Haw. 431, 643 P.2d 55 (1982), the appellant argued that his constitutional right to due process was violated because the commission's published notice failed to comply with the requirements of HRS § 91–9(b)(5) and inform him that any party could be represented by counsel at the hearing. *Id.* at 447–48, 643 P.2d at 58–59.

The *Chang* court found that the appellant had "subsequently received ample notice of his right to representation both informally and by notice sent by [the permit applicant] in full compliance with the statute and rules" that included the omitted information. *Id.* at 454, 643 P.2d at 62.[38] This court rejected the

---

36. Sedimentation Definition, Dictionary.com, http://dictionary.reference.com/sedimentation (last visited Jan. 13, 2014).

37. Sediment Definition, Dictionary.com, http://dictionary.reference.com/sediment (last visited Jan. 13, 2014).

38. Additionally, the court found that the "[a]ppellant's charge that his failure to produce witnesses and effectively present his case ... was due to his lack of notice ... thus amounts to little more than an unfounded attempt inspired by hindsight to attain a second opportunity to

appellant's due process claim because the appellant was able to fully participate in the hearing. *Id.* at 454, 643 P.2d at 62. Thus, this court's focus was whether notice had actually been provided, which could be determined by looking to other communications between the parties. *See also Munoz v. Chandler,* 98 Hawai'i 80, 94, 42 P.3d 657, 671 (App.2002) (rejecting a claim of insufficient notice of right to counsel at a contested case hearing because the record reflected that agency's "various written notices" to the appellants "properly informed them of their right to obtain legal representation"). Therefore, the proceedings in this case demonstrate that adequate notice had been provided by other communications between the parties, and due process was afforded through a meaningful opportunity to be heard.

iii.

 Pila'a 400 was not deprived of due process because it had a meaningful opportunity to present arguments and evidence at the contested case hearing. "[D]ue process and HRS § 91–9 requires that parties be given an opportunity to be heard. This implies a right to submit evidence and argument on the issues." *See Application of Haw. Elec. Light Co.,* 67 Haw. 425, 430, 690 P.2d 274, 278 (1984)[hereinafter *HELCO];* see also *Sandy Beach Def. Fund v. City Council of City & Cnty. of Honolulu,* 70 Haw. 361, 378, 773 P.2d 250, 261 (1989) (citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest.")). In *HELCO,* the issue concerned whether a public utility had been denied due process when

the Public Utility Commission (PUC) based its final conclusion on grounds that had neither been presented to the PUC by either side in a contested case hearing, nor stated in the § 91–9(b) notice. This court concluded that the public utility had received due process because it had a meaningful opportunity to present evidence and arguments to the deciding body. *HELCO,* 67 Haw. at 430–431, 690 P.2d at 278–279.

Therefore, as in *HELCO,* Pila'a 400 was able to participate meaningfully in the contested case hearing, and was fully able to protect their rights and interests. Pila'a 400 presented extensive evidence addressing "the placement of or erection of any solid material on submerged land" at the contested case hearing. Pila'a 400 called four expert witnesses and each testified, at least in part, on the issues of excessive sedimentation and its effects on the impact area.[39] Pila'a 400 submitted two scientific studies—a total of 426 pages of data, pictures, and analysis pertaining to sedimentation and its effects, including the Wallrabenstein and the Grigg Study, noted above. In addition, Pila'a 400 presented multiple lay witnesses as to the condition of the reef and the witnesses' fishing and beach activities in the bay.

These reports and testimony, put forth by Pila'a 400, clearly address the issue of whether the November 26, 2001 mudflow was the cause of damage to Pila'a Bay and reef or could be attributed to natural conditions and the extent of the damage. Pila'a 400 presented extensive evidence and argued that the sediment flow was an act of nature for which it could not be held liable.

Similarly, in *Chang,* this court rejected the appellant's due process claim despite finding that the published notice failed to technically comply with all of the statutory notice re-

block the permit application." *Id.* at 454, 643 P.2d at 62.

**39.** Pila'a 400's expert witnesses specialized in the following fields: civil engineering (Paul Wallrabenstein), geochemistry (Eric De Carlo), and coral reef ecology and coastal oceanography (Richard Grigg and Steven Dollar). The experts testified regarding the cause and effect of the November 2001 mudflow. For example, Grigg testified that it was his understanding that he was

"asked to study the reef at Pila'a and to determine whether or not there had been impact caused by a sediment runoff event or a mudflow back in November 2001." Dollar testified that the harsh environment of Pila'a Bay naturally inhibits coral growth and that "sediment is only one factor in this harshness." He further testified that "without sediment input, the conditions of the reef would not change...."

quirements. This court found that the appellant had subsequently received ample notice of his rights. *Id.* at 454, 643 P.2d at 62; *see also Sandy Beach Def. Fund,* 70 Haw. at 378, 773 P.2d at 261 (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.")) Furthermore the court determined that the appellant's ability to participate in the contested case hearing had not been compromised. *Id.* at 453–55, 643 P.2d at 62–63.

Thus, it is not accurate to argue, as does the Dissent, that Pila'a 400 was unable "to prepare or present a meaningful and adequate defense to this violation during the contested case hearing[,]" or that "Pila'a 400 received no notice that" "the BLNR order[ ] ... to pay more than 4 million dollars" "for the damages to Pila'a Bay could or would stem from" "the unauthorized deposit of sediment onto submerged land" "prior to the close of the contest case hearing." Dissent at 282, 320 P.3d at 947. In fact, Pila'a 400 presented arguments on precisely those grounds.

#### iv.

The record in this case incontrovertibly demonstrates that Pila'a 400 was fully apprised of all relevant issues that were to be determined in the contested case hearing. Pila'a 400 was able to present a complete and vigorous defense to the charges that excessive sedimentation as a result of unauthorized work on the Property caused damage to Pila'a Bay and reef for which DLNR staff had proposed an assessment of $5,830,000. Pila'a 400 cannot complain of faulty notice under HRS § 91–9(b) because the Contested Case Hearing Notice provided reasonable notice in the form of an explicit statement in plain language of the issues involved ("everyone knew this was about mud going on the beach and into the nearshore reef"); by reference to HRS Chapter 183C and HAR Chapter 13–5; and by reference to "excessive sedimentation." Lastly, Pila'a 400 had a meaningful opportunity to be heard and to contest the BLNR's ultimate decision that the "violation was placement of any solid material on land" without a permit. Accord-

ingly, the Contested Case Hearing Notice satisfied the requirements of due process and HRS § 91–9(b).

#### v.

The Dissent appears to agree that Pila'a 400 was on notice that the contested case hearing would concern alleged damages due to excessive sedimentation at Pila'a. Dissent at 276, 320 P.3d at 941. However, the Dissent asserts that "[w]hile the [BLNR's] notice indicates that the alleged <u>damages</u> were 'due to excessive sedimentation at Pila'a,' this is not evidence that Pila'a 400 was on notice that the alleged violation was 'excessive sedimentation.'" *Id.* at 276–77, 320 P.3d at 941–42 (emphasis in original). If Pila'a 400 was aware that damages would be assessed <u>based on</u> excessive sedimentation, then Pila'a 400 would also be aware that the alleged violation, on which damages are assessed, was the excessive sedimentation. There is no substantive distinction between being aware of the alleged basis for damages and the alleged violation, where damages can only be imposed based on a violation.

The cases cited by the Pila'a 400 and the Dissent are not analogous. The Dissent cites *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 497 P.2d 564 (1972) for its argument that "in order to assure procedural due process during an administrative hearing, a party 'must have been apprised of the particulars of the specific claims against him prior to the hearing.'" Dissent at 279, 320 P.3d at 944 (quoting *Silver,* 53 Haw. at 486, 497 P.2d at 572). *Silver* was decided based on facts that are widely divergent from the facts of this case, and did not involve an interpretation of HRS § 91–9.

The *Silver* court held that a private hospital was required to afford procedural due process to a licensed doctor before deciding to deny the doctor staff privileges. *Silver,* 53 Haw. at 479, 497 P.2d at 568. The hospital board based its decision on an investigation into the doctor's performance. *Id.* at 476, 497 P.2d at 566. However, the doctor was not informed of the allegations against him until he was granted a hearing, which took place after his staff privileges had already been revoked. *Id.* It was in this context that the court held the doctor should have been given timely notice prior to the hearing to

enable him to adequately prepare a defense, as well as a written statement of the charges against him. *Id.* at 484–85, 497 P.2d at 571–72.

Similarly, *Villanueva v. Board of Psychologist Examiners*, 175 Or.App. 345, 27 P.3d 1100 (2001), is also factually distinguishable because Pila'a 400 was fully of aware of the issues facing it. *Villanueva* involved a situation where the Board of Psychologist Examiners reprimanded and fined the petitioner for treating a minor child without the custodial parent's consent. *Id.* at 1100. The board "essentially imposed a strict liability standard" based on a violation of one ethical principle, although the notice of proposed disciplinary action alleged that the petitioner had violated six other ethical principles. *Id.* Moreover, "despite petitioner's repeated requests for clarification, the Board did not notify petitioner until after the contested hearing had begun of the rule that he allegedly violated." *Id.* at 1105 (footnote omitted). In this context, the court held that the notice was non-compliant. *Id.* at 1107.

In *Henricks v. Arizona Department of Economic Security*, 229 Ariz. 47, 270 P.3d 874 (App.2012), the appellant challenged a decision finding her liable for overpayment of cash assistance benefits, on the basis that the department notified her that the alleged overpayment was based on the improper issuance of food stamps rather than cash assistance benefits. *Id.* at 874–75. The appellant was informed only when she appeared for the hearing that the notice she had been sent regarding food stamps was a "misprint" and the overpayment was actually for cash assistance benefits. *Id.* at 875. Despite appellant's statement that she was "unaware of the actual problem" and did not "know the

facts for [her] to have brought witnesses," the department proceeded with the hearing. *Id.* It was under these circumstances that the court held that the notice was defective. *Id.* at 877.

In contrast to each of the cases above, Pila'a 400 was aware of the "actual problem," and was able to provide witnesses and evidence at the Contested Case Hearing. As has been established, Pila'a 400 was able to provide extensive evidence and expert and kama'aina testimony at the contested case hearing. Pila'a 400 was apprised of the particulars of the specific allegations against it prior to the hearing and presented a thorough defense on the <u>very</u> issue decided by the BLNR Order. That is, as Pila'a 400 phrased it, "everyone knew this was about mud going on the beach and into the nearshore reef." [40]

## IV.

For the reasons stated, the Judgment on Appeal, filed January 18, 2013, of the ICA is affirmed.

Concurring and Dissenting Opinion by NAKAYAMA, Acting C.J.

I concur with the majority's holding that the BLNR had jurisdiction to institute the enforcement action and that the BLNR was not required to engage in rule-making before imposing financial penalties against Pila'a 400. However, I respectfully dissent from the majority's holding that Pila'a 400 received reasonable notice before the contested case hearing.

Prior to the catastrophic events at issue in this case, Pila'a Bay was characterized as a

---

40. Other cases cited by the Dissent are also factually distinguishable: *Matter of Alvarado v. State*, 110 A.D.2d 583, 488 N.Y.S.2d 177 (N.Y.App.Div.1985) (boxer who received a mailgram to appear before the New York State Athletic Commission was given no notice of the specific charges as required by the Commission's own rules and therefore was unable to file an answer or prepare for hearing); *Ex parte Forest Manor, Inc.*, 739 So.2d 20 (Ala.1998) (nursing home applying for certificate of need for new beds from State Health Planning and Development Agency was not provided opportunity at hearing to cross-examine witnesses or present

rebuttal evidence/argument, and legal counsel was not present and no notice of such rights was provided as required by state administrative rules); *Liberty Mut. Ins. Co. v. Tenn. Dep't of Labor and Workforce Dev.*, No. M2010–02082–COA–R3–CV, 2012 WL 11739 (Tenn.Ct.App. Jan. 3, 2012) (where department listed insurance company's failure to file C20 forms as the basis for penalty assessment when failure to file C21 forms was actual basis, court held that notice provided to opposing party must be reasonably calculated under all the circumstances to apprise party of the claims against it). Dissent at 279–80, 320 P.3d at 944–45.

beautiful area, an excellent site for swimming, snorkeling, fishing, and gathering edible seaweed, and an important habitat for marine life, with coral cover reaching almost 14 percent. Pila'a's inner reef was one of few extensive shallow reefs on the northeast coast of Kaua'i protected from ocean swell by an outer reef and "one of the few remaining high value coral reef flats in the state that had largely escaped encroachment from development and stress from improper land practices."

It is undisputed that on the night of November 26, 2001, during a heavy rainfall, a large portion of recently graded and filled hillside on property owned by Pila'a 400 (the Property) eroded into and engulfed Pila'a Beach and Bay. The earlier unpermitted grading and filling work on the Property, and the failure to implement adequate sediment and water pollution event controls for this unpermitted work, led to the massive pollution that occurred at Pila'a. The State seeks to recover damages for the remedial, restoration, and monitoring costs it expended in response to this avoidable environmental disaster.

The purpose of the contested case hearing was to determine whether the excessive sedimentation at Pila'a was caused by Pila'a 400's violation of land use regulations and, if so, to calculate the cost of the resultant damages. Prior to and throughout the contested case hearing, the only land use violations alleged were unpermitted road construction, grading, filling of gulches, and storm drain construction occurring on the Property prior to Pila'a 400's ownership. It was not until Pila'a 400 filed its purposed findings of fact contending that it was not liable for the land use violations occurring prior to its ownership of the Property that the Department of Land and Natural Resources (DLNR) first suggested that the deposit of sediments onto Pila'a Beach and Bay constituted a violation of Hawai'i Administrative Rules (HAR) § 13-5-24 (1994) (governing land use in the resource subzone). Pila'a 400 immediately objected that it had never received notice that it was being prosecuted for this violation. Despite Pila'a 400's objections, the Board of Land and Natural Resources (BLNR) ultimately

determined that Pila'a 400 was liable for the damage to Pila'a Beach and Bay due to its violation of HAR §§ 13-5-24 and 13-5-30(b) (1994) (prohibiting land use within the conservation district, including the resource subzone, without permit, variance, or other approval) through the unauthorized placement of solid material on conservation district land.

Because the contested case hearing notice failed to alert Pila'a 400 to the particular sections of the statutes and rules involved in the hearing, and because it failed to provide Pila'a 400 with notice of the violation for which it was eventually found liable, the contested case hearing notice violated the Hawai'i Administrative Procedures Act's (HAPA) requirements mandated by HRS § 91-9(b) and Pila'a 400's due process rights. We must not allow the State's eagerness to recoup damages for the significant harm that occurred on conservation district land to run roughshod over the HAPA and the basic tenants of due process. Due process is " 'intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.' " *Bishop v. Mahiko*, 35 Haw. 608, 638 (1940) (quoting *Bank of Columbia v. Okely*, 17 U.S. 235, 244, 4 Wheat. 235, 4 L.Ed. 559 (1819)). To enforce a judgment of more than 4 million dollars against a party who was not informed of the nature of the alleged violation prior to the judgment is an arbitrary exercise of government powers of the kind the due process clause was meant to guard against.

**I. Pila'a 400 did not receive notice of the alleged violation prior to the contested case hearing**

The heavy rainfall on November 26, 2001 caused a large portion of the recently graded and filled hillside on the Property to erode and resulted in a mudflow into the conservation district—covering the beach in several feet of mud and pouring into the bay. This tragic disaster severely degraded the condition of Pila'a Bay. During a scientific assessment conducted by the DLNR in June of 2002, the shallow areas of the bay suffered from chronic turbid conditions and corals

were bleached, dead, dying, and becoming overgrown by algae. The assessment concluded that approximately 2,943 square meters of live coral was destroyed by the November 26, 2001 mudflow and subsequent sedimentation. Although much of the sediment has been cleansed from the beach by natural wave action, sediment and its negative impacts remain at Pila'a. It is unknown if the area will ever return to its pre-mudflow conditions.

In cases of such egregious damage, the desire to hold responsible parties liable is understandable, but it must not overshadow the importance of affording all parties due process of law. Subsequent to the catastrophic mudslide of November 26, 2001, the DLNR initiated an investigation into the illegal work conducted within the conservation district at Pila'a. On January 28, 2002, the DLNR provided a notice to Pflueger Properties and James Pflueger, Trustee (the former owners of the Property), that they were "in violation of [HAR] title 13, Chapter 5, entitled 'Conservation District' providing for land use within the Conservation District, enacted pursuant to Chapter 183C." The notice stated that "[t]he following uses were conducted on the subject premises: grading, grubbing, cutting, and culvert construction" and that "[t]hese uses were not authorized by the [DLNR]." (Emphasis added).

The DLNR's subsequent report, entitled "Unauthorized Grading, Grubbing, Filling, Road Construction, Landscaping, Drainage Improvements, and Damages to State Land and Natural Resources due to Excessive Sedimentation at Pila'a" clarified that the DLNR based its jurisdiction over the damages at Pila'a Bay, on these alleged violations occurring on land, and not on the illegal dumping of sediments in Pila'a Bay. The report summarized the unauthorized land uses as follows:

The first part of this report documents the unauthorized land uses within the Conservation District. The unauthorized uses include [1] an unauthorized dirt road through gulch 2, and along the shoreline, ▮ an unauthorized vertical cut in the coastal bluff, [3] unauthorized fill [1] and grading at the seaward extent of gulch 2 and [4] unauthorized storm drain construction adjacent to the beach. In addition, there are unauthorized improvements on the west side of the property consisting of a dirt road and graded/grassed picnic area that abuts the shore.

These unauthorized improvements resulted in extensive damages to shoreline and marine resources at Pilaa Bay, which was the focus of this report.

(Emphasis added). The land uses summarized in the report involved unauthorized construction activities, or "improvements," occurring on land outside of the resource subzone. The report also incorrectly named "Pflueger Properties" as the landowner, instead of "Pila'a 400." While Pflueger Properties was the landowner at the time of the illegal activities discussed in the report, these activities had concluded before January 23, 2001, when Pila'a 400 assumed ownership of the property.

James Pflueger, Pflueger Properties, and Pila'a 400 (collectively, the Pflueger Parties) filed a written request for a contested case hearing with the BLNR, indicating that the Pflueger Parties contested not only the DLNR's calculation of damages, but also the Pflueger Parties' liability for these damages. On September 2, 2003, the BLNR determined that "[t]he landowner (James Pflueger)" had committed the first four land use violations detailed in the DLNR report—described as: "failing to obtain the appropriate approvals for road construction, grading, filling, and storm drain construction"—and assessed a fine. These violations were not assessed against Pila'a 400, and the violations did not include the dumping of sediment onto submerged land.

By notice of October 3, 2003, the BLNR indicated that it would "conduct a contested case hearing . . . regarding an enforcement action involving the alleged damages to State land(s) and natural resources due to excessive sedimentation at Pilaa." While the no-

---

1. This explanation of the unauthorized land uses demonstrated that the use of the word "filling" in the title of the report referred to the unauthorized fill of gulch 2, and not to any filling of the submerged land of Pila'a Bay.

tice indicates that the alleged <u>damages</u> were "due to excessive sedimentation at Pilaa," this is not evidence that Pilaʻa 400 was on notice that the alleged <u>violation</u> was "excessive sedimentation." Rather, all previous communications from the DLNR had characterized the "excessive sedimentation" as a <u>result</u> of alleged land use violations.[2] The notice also stated: "The hearing will be held pursuant to Chapters 91 and 183C, [HRS], and Chapters 13–1 and 13–5, [HAR]."

Prior to the commencement of the BLNR contested case hearing, the parties submitted conflicting statements of the issues. The DLNR stated: "The only issue in this contested case proceeding is the determination of the amount of damages to be assessed against the Pflueger Parties for damages to the beach, reef, and marine environment ... which were largely the result of excessive sediment input dating from November 2001 and thereafter." The Pflueger Parties stated that they requested a contested case hearing regarding recommendations made by the DLNR to the BLNR including that: "The landowner (James Pflueger) violated the provisions of Chapter 183C, Hawaiʻi Revised Statutes, and Chapter 13–5, [HAR], by damaging state land and natural resources stemming from unauthorized land uses, for a penalty of $5,830,000."

The DLNR raised a number of objections to the Pflueger Parties' statement of the issues. The DLNR argued that as the BLNR had "already found that the landowner violated the conservation district laws 'by failing to obtain the appropriate approvals for road construction, grading, filling, and storm drain construction' ... [t]hese issues and facts necessary to support the [BLNR]'s adoption of that finding and conclusion, therefore, are not issues in this contested case proceeding." (Emphasis added). This indicates that, at that time, the DLNR sought to base Pilaʻa 400's liability on the violations that the BLNR concluded James Pflueger had committed, and not on any as of yet unalleged dumping of sediment onto submerged land by Pilaʻa 400.

On March 12, 2004, the Pflueger Parties submitted a motion for judicial notice of Pilaʻa 400 as the landowner and to dismiss Pflueger Properties and James Pflueger. The DLNR acknowledged that its report to the BLNR had "identifi[ed] the landowner as the target of this enforcement action" and "concede[d] that Pflueger Properties and James H. Pflueger, not being the landowners, should therefore be dismissed from this action."

In its opening brief to the hearing officer, Pilaʻa 400 stated that "[i]n order to prevail on a claim for damage to State land, <u>the DLNR must establish that 1) State land was in fact damaged by Pilaʻa 400[sic] violation of land use regulations within the Conservation District;</u> [and] 2) the measure of damage is reasonably certain and not founded upon speculation, conjecture, or guess." (Emphasis added).

In its November 10, 2004 proposed findings of fact, Pilaʻa 400 raised the defense that it could not be held liable for the damages to Pilaʻa Bay because it was not the property owner at the time of the road construction, grading, and gulch filling within the conservation district—the unlawful activities charged in the violations. This attestation by Pilaʻa 400 appears to have alerted the DLNR to a grave weakness in its case. By allowing the dismissal of Pflueger Properties and James Pflueger, the DLNR had allowed the dismissal of the only parties responsible for the alleged violations of road construc-

---

**2.** The majority states that "[i]f Pilaʻa 400 was aware that damages would.be assessed <u>based on</u> excessive sedimentation, then Pilaʻa 400 would also be aware that the alleged violation, on which damages are assessed, was the excessive sedimentation." Majority at 273, 320 P.3d at 938 (emphasis in original). The majority reasons that "[t]here is no substantive distinction between being aware of the alleged basis for damages and the alleged violation, where damages can only be imposed based on a violation." Majority at 273, 320 P.3d at 938. These statements are directly contradicted by the facts of this case. Here, the DLNR repeatedly represented that the alleged violations were unauthorized construction activities occurring outside of the resource subzone that caused the flow of sediments into Pilaʻa Bay and the resultant damages from excessive sedimentation. Therefore, not only are the basis of damages and the basis of a violation generally distinguishable, but here, Pilaʻa 400 premised its defense on its understanding that the deposit of sediments onto submerged land was not the alleged violation.

tion, grading, and filling. At this late date, the DLNR was forced to craft a new theory under which Pila'a 400 could be held liable for the damages to Pila'a Beach and Bay; a theory of which Pila'a 400 had no prior notice.

In the DLNR's November 10, 2004 proposed findings of fact, it suggested for the first time that the "mudflow and subsequent sedimentation events constitute[d] placement of solid material on land and grading of land and ... marine construction within the meaning of HAR § 13–5–24." Despite Pila'a 400's vehement objections that it had received no notice of this alleged violation, the Hearing Officer recommended that "[t]he November 26, 2001, mudflow and subsequent sedimentation events constitute marine construction within the meaning of HAR § 13–5–24.... Pila'a 400 did not have a [DLNR] or [BLNR] permit authorizing marine construction (including filling of submerged land). Nor could a permit be obtained for the filling of submerged land where protected marine resources are destroyed."

The BLNR concluded that Pila'a 400's violation was "placement of any solid material on land in the form of dumping or allowing to be put on conservation land (including submerged land) of a large unknown amount of dirt and sediment ... without a permit as required by HAR §§ 13–5–24 and 13–5–30(b)."

The majority is correct that the contested case hearing focused primarily on the damages to Pila'a Beach and Bay. The majority also cites to the numerous instances in which Pila'a 400 was notified that this case concerned "damages to state land and natural resources" and Pila'a 400's general awareness that the damage to the submerged land of Pila'a Bay was at issue in this case. Majority at 269, 320 P.3d at 934. The majority concludes the Pila'a 400 was "unequivocal[ly] ... informed that the core issue to be determined at the contested case hearing was the damage to the reef caused by sedimentation." Majority at 269–70, 320 P.3d at 934–35.

Clearly, Pila'a 400 was aware that this case concerned its potential liability for the damages to Pila'a Beach and Pila'a Bay (including submerged land) caused by excessive sedimentation from the mudflow of November 26, 2001. However, the pertinent question is whether Pila'a 400 had notice of which sections of HAR chapter 13–5 it was accused of violating or what actions the DLNR alleged constituted a land use violation. At the time of Pila'a 400's alleged violation, HRS § 183C–7(b) authorized the collection of a penalty for damages to State land as a result of "violating [HRS chapter 183C] or any rule adopted in accordance with this chapter." HRS § 183C–7(b). Therefore, in order to prove that Pila'a 400 was liable for damages to State land under HRS § 183C–7(b), the DLNR was required to first prove that Pila'a 400 violated a section, or sections, of HRS chapter 183C or HAR chapter 13–5 and that this violation caused the damages to State land.

## II. Pila'a 400 did not waive its argument that it received insufficient notice of the alleged violations

Pila'a 400's appeal is a secondary appeal of an administrative agency's decision and we " 'apply the same standard of review as that applied upon primary review by the circuit court.' " *AlohaCare v. Ito*, 126 Hawai'i 326, 341, 271 P.3d 621, 636 (2012) (quoting *Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations*, 70 Haw. 72, 80, 762 P.2d 796, 800–01 (1988)). Therefore, any "findings of fact" entered by the circuit court are not binding on this court. Furthermore, because both the circuit court and the ICA reviewed this case on appeal, neither court could properly enter "findings of fact."

It is a patent misrepresentation of the proceedings in this case to state that "Pila'a 400 has conceded that it was 'aware of the general issues' to be determined at the contested case hearing and it was 'sufficiently apprised of the nature of the proceeding' such that the BLNR sought damages based on placement of solid material on submerged land." Majority at 268, 320 P.3d at 933. Although Pila'a 400 was of course "aware of the general issues"—that the contested case proceeding concerned the mudslide of November 26, 2001—it was not, and it has not conceded, that it was sufficiently apprised of the nature of its violation. At every opportu-

nity, Pila'a 400 objected to the lack of notice it received that the alleged violation was the placement of solid material on submerged land in violation of HAR §§ 13–5–24 and 13–5–30(b). Specifically, Pila'a 400 raised this objection before the hearing officer, before the BLNR, before the circuit court, before the ICA, and before this court. In its application for writ of certiorari, Pila'a 400 stated that despite "[t]he ICA's reference to Pila'a [400]'s awareness of the 'general issues' and the 'nature of the proceeding' . . . in order to assure procedural due process during an administrative hearing, a party 'must have been apprised of the particulars of the specific claims against him prior to the hearing.'" (quoting *Silver v. Castle Mem'l Hosp.*, 53 Haw. 475, 486, 497 P.2d 564, 572 (1972)). Pila'a 400 never conceded that it received notice that the alleged violation was placement of solid material on submerged land and it properly raised the issue of notice before this court.

### III. The contested case hearing notice did not meet the requirements of HRS § 91–9(b)(3)

HRS § 91–9 requires that an agency's notice for a contested case "shall include . . . the <u>particular sections of the statutes and rules involved</u>" in order to ensure "an opportunity for hearing after reasonable notice." (Emphasis added). It is undisputed that the BLNR's Notice cited only to the HRS and HAR chapters and not to the particular sections of the relevant statutes and rules. Pila'a 400's awareness of the nature of the proceedings and the general issues involved does not satisfy the specificity required by this statutory provision.

" '[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.'" *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (quoting *Citizens for Prot. of N. Kohala Coastline v. Cnty. of Haw.*, 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999)).

There is no ambiguity in the language of HRS § 91–9(b)(3). Notice that fails to cite to "the particular sections of the statutes and rules involved," does not meet the statutory requirements of HRS § 91–9(b)(3).

The majority states that because HRS § 91–9(b)(3) requires citation to all of the statutes and rules involved, the BLNR's notice stating that the hearing would be held pursuant to HRS chapter 183C and HAR chapter 13–5 was sufficient. Majority at 279–80, 320 P.3d at 944–45. The majority's conclusion is based upon its reasoning that " 'involved' has a broad and inclusive definition" and that the list of the particular HAR chapter 13–5 sections "involved" was too lengthy to enumerate. Majority at 270–71, 320 P.3d at 935–36. However, the majority's reading strips the statute of its fundamental requirement that the notice be "reasonable." *See* HRS § 91–9. The BLNR's notice stated that the action would be held pursuant to all of the chapters and rules regarding conservation district lands. The breadth and vagueness of the BLNR's notice failed to alert Pila'a 400 to the issues to be resolved at the contested case hearing and prevented Pila'a 400 from preparing an adequate defense. Such a notice is inherently unreasonable.[3]

Hawaii's courts have never interpreted this provision, however courts in other jurisdictions have consistently read identical notice provisions in their administrative procedure acts strictly, requiring agencies to provide notice of "the <u>particular sections</u> of the statutes and rules involved." These courts have unanimously concluded that, where the defendant was not informed of the specifics of the alleged violation prior to the contested case hearing, the notice was insufficient. *See, e.g., Liberty Mut. Ins. Co. v. Tenn. Dep't of Labor & Workforce Dev.*, 2012 WL 11739, at \*6–7 (Tenn.Ct.App. Jan. 3, 2012) (holding the notice insufficient because it failed to "includ[e] reference to the particular sections of the statutes and rules involved"); *Hen-*

---

**3.** The notice requirements contained in HRS § 91–9 must, at a minimum, be interpreted as requiring reasonable notice to meet constitutional due process requirements. Therefore, the notice must provide sufficient reference to the statutes and rules involved to give the party " 'notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)); *see also infra* Part IV (discussing due process notice requirements).

*ricks v. Ariz. Dep't of Econ. Sec.,* 229 Ariz. 47, 270 P.3d 874, 877 (App.2012) (concluding that because the notice did not reference the "particular sections of the statutes and rules involved" the defendant was "unprepared for her hearing and unable to effectively challenge or verify" the agency's allegations); *Villanueva v. Bd. of Pshychologist Exam'rs,* 175 Or.App. 345, 27 P.3d 1100, 1105–06 (2001) (giving the words of the statute "their plain and natural meaning," notice was insufficient where it failed to reference "particular sections of the statutes and rules involved"); *Ex parte Forest Manor, Inc.,* 739 So.2d 20, 22–23 (Ala.1998) (holding that notice that failed to include "particular sections of the statutes and rules involved" was lacking because "notice must contain all of the information mandated by the statute"); *Matter of Alvarado v. State,* 110 A.D.2d 583, 488 N.Y.S.2d 177, 178–79 (N.Y.App.Div.1985) (holding that notice that failed to reference the "particular sections of the statutes and rules involved" contained "no specific charges to which they could file an answer or prepare for hearing, and no statement of legal authorities").

Giving effect to the plain meaning of HRS § 91–9(b)(3), Respondents were required to provide Pila'a 400 with notice of the particular sections of the statutes and rules involved in its contested case hearing. The notice's reference to HRS chapter 183C and HAR chapter 13–5 failed to meet the specificity required by HRS § 91–9(b)(3).

## IV. The contested case hearing notice violated Pila'a 400's due process rights

The Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution, guarantee that no person will be deprived of "life, liberty or property without due process of law." *Korean Buddhist Dae Won Sa Temple of Haw. v. Sullivan,* 87 Hawai'i 217, 242 nn. 28–29, 953 P.2d 1315, 1340 nn. 28–29 (1998). "The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest." *Sandy Beach Def. Fund v. City Council of City & Cnty. of Honolulu,* 70 Haw. 361, 378, 773

P.2d 250, 261 (1989). " 'To satisfy the requirements of due process, an administrative agency must give the party charged a clear statement of the theory on which the agency will proceed with the case.' " Charles H. Koch et al., *Administrative Law and Practice* § 5:32 (3d ed. 2010) (quoting *Yellow Freight Sys., Inc. v. Martin,* 954 F.2d 353, 357 (6th Cir.1992)); *see also Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

We have frequently stressed that " '[d]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Sandy Beach Def. Fund,* 70 Haw. at 378, 773 P.2d at 261 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Therefore, the notice of an agency action must be sufficiently specific to alert the party to the purpose of the action and to allow the party to prepare a defense. *See Mathews,* 424 U.S. at 334, 96 S.Ct. 893 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " (quoting *Joint Anti–Fascist Refugee Comm.,* 341 U.S. at 171–172, 71 S.Ct. 624 (Frankfurter, J., concurring))); *Matter of Mangini v. Christopher,* 290 A.D.2d 740, 736 N.Y.S.2d 180, 184 (N.Y.App.Div.2002) (" 'It is axiomatic that due process precludes the deprivation of a person's substantial rights in an administrative proceeding because of uncharged misconduct and it necessarily follows, therefore, that a respondent in such a proceeding is entitled to fair notice of the charges against him or her so that he or she may prepare and present an adequate defense and thereby have an opportunity to be heard.' " (ellipses omitted) (quoting *Matter of Block v. Ambach,* 73 N.Y.2d 323, 540 N.Y.S.2d 6, 537 N.E.2d 181, 184 (1989))).

In *Silver,* this court considered whether a physician whose staff privileges were not re-

newed by a hospital board received adequate notice pursuant to the requirements of procedural due process. 53 Haw. at 476–77, 484, 497 P.2d at 566–67, 571. We reasoned that although the physician was provided with a hearing, it did not meet the requirements of due process:

> [The physician] was never provided with specific written charges as to why his performance was not deemed acceptable. He was merely read an indictment of general allegations at the hearing. In order for appellant's right to a hearing to be effective he must have been apprised of the particulars of the specific claims against him prior to the hearing. In this case appellant had no opportunity to investigate the basis for his performance being questioned. As such his right to present a defense was rendered nugatory.

*Id.* at 486, 497 P.2d at 572. We stated that due process requires that one receive notice "sufficiently adequate to apprise him of the specific charges against him." *Id.* at 485, 497 P.2d at 571. While *Silver* is factually distinguishable from the present case, the basic due process notice requirements are equally applicable—due process required that Pila'a 400 receive notice of the specific violation of which it was accused.

The majority cites to our decision in *In re Hawai'i Electric Light Co., Inc.*, 67 Haw. 425, 690 P.2d 274 (1984) for the principle that an agency may "base[ ] its final conclusion on grounds that had neither been presented ... by either side in a contested case hearing, nor stated in the [HRS] § 91–9(b) notice." Majority at 272, 320 P.3d at 937. In *In re Hawai'i Electric*, the petitioner alleged that the notice was insufficient because it failed to specify all of the issues that could be considered in determining whether the proposed tariffs, rates, and rate structure were reasonable; specifically the notice failed to identify a factor that the agency used to reach its final determination. 67 Haw. at 429, 690 P.2d at 277. We reasoned that "[t]he nature and complexity of rate-making proceedings make it impractical to adopt a particularistic standard of issue identification." *Id.*

*In re Hawai'i Electric* is easily distinguished from this case. Here Pila'a 400 is not requesting notice of an amorphous array of possible issues that an agency may consider in reaching its decision. Instead, Pila'a 400 alleges only that it did not receive notice of the nature of the alleged violation which became, belatedly, the basis of the entire proceeding. Mandating that the BLNR provide notice to alleged violators of the land use provisions they are accused of violating is a reasonable requirement, in addition to being a fundamental requirement of due process.

The majority cites to *Chang v. Planning Comm'n of the Cnty. of Maui*, 64 Haw. 431, 445, 643 P.2d 55, 58 (1982), for the principle that notice is not insufficient due to mere technical violations. Majority at 272, 320 P.3d at 937. While this principle is sound, an examination of *Chang* demonstrates the wide disparity between excusable technical violations and the events here. In *Chang*, a published notice failed to comply with the requirement of HRS § 91–9(b)(5), that a party be informed of its right to be represented by counsel at a hearing. 64 Haw. at 447–48, 643 P.2d at 58–59. However, the petitioner in *Chang* received a separate notice which included information regarding his right to counsel and he was later orally advised of his right to retain counsel. *Id.* at 448, 643 P.2d at 59. This court held that "while the planning commission may have committed a technical statutory violation in its published notices, appellant cannot be heard to complain of harm or injustice caused thereby as he subsequently received ample notice of his right to representation." *Id.* at 454, 643 P.2d at 62.

The circumstances here are vastly different than the circumstances in *Chang*. Here, prior to the close of the hearing, Pila'a 400 was actually unaware that the violation from which its liability stemmed was unauthorized dumping on submerged land pursuant to HAR §§ 13–5–24 and 13–5–30(b). As discussed in Part I, a review of the record of communications reveals that not only did Pila'a 400 believe, but the DLNR itself alleged, that Pila'a 400's liability stemmed from the four land use violations the BLNR found the "landowner (Mr. Pflueger)" committed in its September 2, 2003 determination. In its pre-hearing filings, and during the contested

case hearing, Pila'a 400 repeatedly argued that it could not be held liable for these violations. Because Pila'a 400 was not provided with notice of a possible violation of HAR §§ 13–5–24 and 13–5–30(b) by the unauthorized dumping of sediments onto submerged land, it was not able to prepare or present a meaningful and adequate defense to this violation during the contested case hearing.

## V. Conclusion

The BLNR ordered Pila'a 400 to pay more than 4 million dollars in damages as a result of the unauthorized deposit of sediments onto submerged land. However, prior to the close of the contested case hearing, Pila'a 400 received no notice that its liability for the damages to Pila'a Bay could or would stem from this violation. The notice Pila'a 400 received neither cited to the specific rules governing such a violation, nor allowed Pila'a 400 to prepare a defense to such a charge. This notice violated both HRS § 91–9(b)(3) and the due process clause. To permit an administrative agency to provide such woefully insufficient notice before depriving an individual of a protected interest sets a dangerous precedent for Hawaii's administrative law.